BENEFICIAL PERSONNEL SERVICES
OF TEXAS, INC., and Business
Staffing, Inc., Appellants,

v.

Ramon REY, Appellee.

No. 08–95–00185–CV.

Court of Appeals of Texas,
El Paso.

June 27, 1996.

Rehearing Overruled Aug. 14, 1996.

Rick G. Strange, Cotton, Bledsoe, Tighe & Dawson, Midland, for Appellants.

Robert Trenchard, Jr., Trenchard & Buckingham, Kermit, for Appellee.

Before BARAJAS, C.J., and LARSEN and CHEW, JJ.

## OPINION

LARSEN, Justice.

This appeal stems from a judgment, following jury trial, favoring Ramon Rey against Beneficial Personnel Services of Texas, Inc. ("BPS") and Business Staffing, Inc. ("BSI"). The parties stipulated that BPS breached its contract with Rey and the amount of his damages from the breach. The jury found that BPS committed fraud and that BPS and BSI operated as a single business enterprise. It assessed $103,000 in actual damages and $550,000 as exemplary damages. The trial court rendered judgment against both BPS and BSI. Defendants appeal.

### FACTS

Ramon Rey is an oil field worker in west Texas. Before 1991, he was employed by White Well Service as a well service floor hand. Mr. Rey is forty-three years old and a legal resident of the United States. He was born in Mexico where he attended school only through the second grade. He is married to Teresa Rey and they have three children.

In 1991, Beneficial Personnel Services of Texas, Inc., an employee leasing company headquartered in The Woodlands, approached White Well's owner. BPS/BSI proposed that White Well terminate all its employees, who would be immediately hired by BPS/BSI then leased back to White Well to perform exactly the same work. Johnny White, White Well Service's owner, agreed to this arrangement, and fired all his employees, including Rey. They were then hired by BPS/BSI and leased back to White Well. As part of its agreement with White Well, BPS/BSI provided administrative services for personnel, including payroll, a safety program, a "cafeteria plan," and most importantly, benefits for injuries compensable under the Texas Workers' Compensation Act, which were to be provided by an insurance carrier not admitted to the Texas Workers' Compensation system. That is, although BPS/BSI obligated itself to provide benefits, it would not be a subscriber to the Texas Workers' Compensation Act.

When his employment was changed from White Well to BPS/BSI, Ramon Rey signed an agreement which provided (in Spanish):

3. *WORKER'S COMPENSATION BENEFITS.* BPS of Tx/BSI has agreed in the PERSONNEL LEASE AGREEMENT with its Client Company to provide worker's compensation benefits provided by a non-admitted insurance carrier to EMPLOYEE for injuries compensable under the Texas Worker's Compensation Act and similar acts of other jurisdictions (collectively referred to as the 'Act') while EMPLOYEE is assigned to CLIENT COMPANY and to waive (give up) their common law defensed [sic] against the EMPLOYEE as set forth in the corresponding Act. In exchange, the *EMPLOYEE agrees to limit his/her recovery* against BPS of Tx/BSI and CLIENT COMPANY for such compensable injuries *to benefits allowed by the corresponding Act.* These benefits are provided by a non-admitted insurance carrier.

Because our worker's comp. Benefits are provided by a non-admitted carrier the New 'Act' requires that BPS of Tx/BSI provides you with the following statement:

"BPS of Tx/BSI DOES NOT have worker's compensation insurance coverage to

protect you from damages because of work-related illness or injury."

On May 12, 1992, while servicing an oil rig, Rey injured his back. Rey was first examined by Dr. D.W. Davison who took x-rays, prescribed medication, and started Rey on physical therapy. When Rey's condition did not improve, Dr. Davison referred Rey to Dr. Phillip Zeeck, an orthopedic surgeon. Dr. Zeeck first saw Rey on July 9, 1992. A Magnetic Resonance Imaging revealed that Rey had a herniated nucleus pulposus. Dr. Zeeck recommended a discography to be followed by a probable percutaneous disc excision. This surgery was initially scheduled for July, but was not performed when Dr. Zeeck was told that neither BPS/BSI nor its insurer would pay for the procedure. The evidence indicated that Kenneth Cobb, BPS/BSI's risk manager, made the decision to refuse payment for the surgery despite Dr. Zeeck's recommendation and the concurrence of Amanda Romero, an R.N. and independent medical adviser hired by BPS/BSI to oversee Mr. Rey's claim.[1] The surgery was finally performed on October 6, 1992. Dr. Zeeck released Rey to return to light duty in February 1993.

Rey's injury resulted in an 8 percent impairment to his whole body, according to the AMA guidelines used by the Texas Workers' Compensation Commission to establish disability ratings. BPS/BSI paid him nothing for his disability, however, until after he had filed suit. In addition, while he was injured, BPS/BSI paid Rey only $120 per week compensation, less than half the amount he would be entitled to receive under the Texas Workers' Compensation Act. Over $4,000 in uncontroverted medical bills, likewise, were not paid.

BPS/BSI laid the blame for mishandling Rey's claim on Risk Management Inc., a claims adjusting firm hired by BPS/BSI's insurer. Amanda Romero testified that RMI was very hard to work with: her phone calls went unanswered, she could not get RMI to make treatment decisions, and its employees would ignore her recommendations for treatment and coverage. With Rey, RMI's adjuster just wanted a disability rating and a release for Rey to return to work, despite the doctor's diagnosis of a serious back injury and recommendation for surgery. Romero testified, moreover, that BPS/BSI had the same attitude towards claims, and that it was BPS/BSI that canceled Rey's surgery, not anyone at RMI. BPS/BSI made no effort to explain why it did nothing to remedy the situation with RMI, which was its agent for handling the claims of injured employees. BPS/BSI's president testified that the company stopped doing business with RMI only because its insurance policy was canceled, not because they were dissatisfied with RMI's work.

The policy insuring BPS/BSI workers was issued through Corporate Underwriters, a company prohibited from doing business in Texas and located in the Turks and Caicos Islands. The insurance was a full retrospective policy, which meant that the insurer assumed no risk, and that dollar-for-dollar, every claim paid was the responsibility of BPS/BSI. To cover claims, BPS/BSI would deposit money in a designated bank account whenever the balance fell below a certain level.

One BPS/BSI officer testified that in November 1992, Corporate Underwriters suddenly canceled this policy. Shortly before this, RMI ceased adjusting claims or making benefit payments to BPS/BSI employees. BPS/BSI never offered any explanation for this cancellation; indeed, another officer testified, to the contrary, that the policy was *not* canceled, but that BPS/BSI made the decision to stop doing business with Corporate Underwriters.

Whatever happened, BPS/BSI then began handling employee benefit claims internally. No one ever researched the claims for underpayments or failures to pay, however, and

---

1. Ms. Romero is an employee of General Rehabilitation Services. She is a registered nurse providing medical case management for insurance carriers, usually in workers' compensation cases. The insurers hire her to oversee medical case management, and to insure that the treatment recommended is reasonable. She meets with physicians, physical therapists, and other providers to provide this service. She was medical case manager for Ramon Rey's claim from June 1992 until November 1992.

risk manager Kenneth Cobb testified that RMI's manner of dealing with claimants was "not our problem."

Following the presentation of the plaintiff's case, BSI moved for directed verdict. Rey moved to amend his petition, to include an allegation that BPS and BSI were a "single business enterprise." The trial court granted the trial amendment and the issue was submitted to the jury. The jury determined that BPS had committed fraud against Rey and that BPS and BSI were operated as a single business enterprise, awarding actual and punitive damages. The trial court entered judgment on the jury's findings. BPS/BSI appeals, urging nineteen points of error. We affirm.

### Trial Amendment

In Points of Error One and Two, appellants complain that the trial court erred in allowing Rey to amend his pleadings at trial and in denying defendants' motion for continuance. Pursuant to TEX.R.CIV.P. 63 and 66, a party may amend his pleadings during the course of a trial. *Zavala v. Trujillo*, 883 S.W.2d 242, 245 (Tex.App.—El Paso 1994, writ denied), *citing Greenhalgh v. Service Lloyds Ins. Co.*, 787 S.W.2d 938, 940 (Tex.1990). If a party objects to evidence on the ground that it is outside the issues framed by the pleadings, the court may allow amendment and shall do so freely when the presentation of the merits will be subserved thereby and the objecting party fails to satisfy the court that the amendment would prejudice that party in maintaining an action or defense on the merits. *State Bar of Texas v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex.1994); TEX.R.CIV.P. 66.

A court may not refuse a trial amendment unless (1) the opposing party presents evidence of surprise or prejudice; or (2) the amendment asserts a new cause of action or defense, and thus is prejudicial on its face. *Kilpatrick*, 874 S.W.2d at 658. The burden of showing surprise or prejudice rests on the party resisting the amendment. *Id.* The decision to permit or deny the amendment rests within the sound discretion of the trial court. *Id.*; *Concha v. Concha*, 808 S.W.2d 230, 231 (Tex.App.—El Paso

1991, no writ). Thus, the court's decision to allow or deny a trial amendment may be reversed only if it is a clear abuse of discretion. *Hardin v. Hardin*, 597 S.W.2d 347, 349–50 (Tex.1980). The test for abuse of discretion is not whether, in the opinion of this court, the facts present an appropriate case for the trial court's actions. Rather, it is a question of whether the court acted without reference to any guiding rules and principles. *Zavala*, 883 S.W.2d at 245.

Appellants complain that Rey's pleadings gave no indication that he sought to hold BSI liable under any theory of corporate liability other than that pleaded. They argue that Rey's third amended petition alleged only that BPS and BSI were the same or successor corporations and made no mention of veil piercing theories. Appellants thus contend that the "single business enterprise" amendment is prejudicial on its face because it added an entirely new cause of action.

We note initially that "single business enterprise" is not a cause of action, but rather a theory for imposing liability where two or more business entities act as one. Under the doctrine, when corporations are not operated as separate entities but rather integrate their resources to achieve a common business purpose, each corporation may be held liable for wrongful acts done in pursuit of that purpose. *See Paramount Petroleum Corp. v. Taylor Rental Center*, 712 S.W.2d 534, 536 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). Thus, the trial amendment did not inject a new cause of action into the trial and was not prejudicial on its face. Moreover, plaintiff's third amended petition stated:

> Plaintiff would show that Defendant Beneficial Personnel Services of Texas, Inc. has changed its name to Defendant Business Staffing, Inc. or, in the alternative, that Defendant Business Staffing Inc. is a successor entity to Defendant Beneficial Personnel Services of Texas, Inc. Both are hereinafter referred to as 'Defendant BPS.'

This allegation was sufficient notice that Rey sought to hold both appellants liable for his damages through theories of corporate liabil-

ity. Rey alleged that BPS and BSI are the same company, and referred to both defendants as one throughout the pleadings. We find that appellants' claim of surprise is not supported by the record.

We next turn to whether appellants demonstrated prejudice as a result of the trial amendment. *Greenhalgh v. Service Lloyds Ins. Co.,* 787 S.W.2d 938, 939 (Tex.1990). Appellants claim that allowing the amendment without granting a continuance was prejudicial because they were not prepared to refute evidence on the issue. Appellants claim they were prepared to defend against Rey's sole allegation that BPS and BSI were the same company, but not against the single business entity theory. They claim that nothing in Rey's live pleadings gave them notice that Rey sought to hold BSI liable for the debts of BPS.

■ Appellants' formal bill of exception urged that they could not refute the single business enterprise theory without the testimony of Rick Chapman, the chief finance officer with BPS/BSI, who was then in Houston. They further contended that it was necessary to gather documents showing the corporate formalities of each company, including articles of incorporation, corporate minutes, tax returns, accounting records, and bookkeeping procedures. Appellants urged a seven-day continuance to allow them to develop this evidence. This evidence, however, albeit useful in rebutting other theories for disregarding the corporate form, is irrelevant to the elements of single business enterprise.[2] The elements that must be shown to support a finding of single business enterprise are: common employees, common offices, centralized accounting, payment of wages by one corporation to another corporation's employees, common business name, services rendered by the employees of one corporation on behalf of another corporation, undocumented transfers of funds between corporations, and unclear allocation of profits and losses between corporations. *Castleber-*

*ry v. Branscum,* 721 S.W.2d 270, 271–72 (Tex.1986); *Old Republic Ins. v. EX–IM Services,* 920 S.W.2d 393, 395–96 (Tex.App.—Houston [1st Dist.] 1996, n.w.h.); *Paramount Petroleum,* 712 S.W.2d at 536.

■ We find that testimony from Harry Sewill, president and CEO of BPS/BSI, clearly established single business enterprise. Sewill testified that the common business purpose of BPS and BSI was employee leasing. He acknowledged that both companies were located in Texas, and used the same address and telephone number. Sewill also testified that BPS and BSI had common officers, common employees, and the same shareholders. Sewill agreed that both companies kept records at the same office, used the same accountants, the same checkbook, and that one company paid the wages of employees for both. Finally, both companies were covered under the same insurance policy for compensation of injured employees.[3] Accordingly, with evidence of a single business enterprise so plainly established, we cannot say that the trial court clearly abused its discretion in allowing the amendment and denying the continuance.

■ Finally, we believe defendants waived error by refusing the trial court's offer of a one-day continuance. Although of shorter duration than requested, this delay would have allowed time for Rick Chapman, BSI's necessary witness, to fly from Houston with the required records. Appellants declined the one-day continuance and elected to go forward with the case. Thus, even if appellants were prejudiced or surprised, they were offered accommodation by the trial court which they refused, waiving any claimed error. *See Black v. J.I. Case Co., Inc.,* 22 F.3d 568, 573 (5th Cir.1994). We overrule appellants' first two points of error.

### Single Business Enterprise Liability

■ In Points of Error Three and Four, appellants contend that the trial court erred

---

2. Moreover, BPS/BSI's brief claims that BSI was "prepared to show that in fact it was a separate corporation from BPS." The evidence listed in the bill of exception is all relevant to the defense as BSI understood it before the trial amendment.

3. We also note that both companies have been represented by the same counsel throughout this proceeding, although it would appear that their interests are adverse on the issues of single business enterprise and joint and several liability.

in permitting Rey to recover damages from BSI because the single business enterprise theory cannot be used as a basis for imposing tort liability. Appellants argue that because the jury found in response to questions two and three that BPS committed fraud and was liable for damages, but was never asked to make a finding that BSI committed fraud, no fraud damages may be assessed against BSI.

We disagree. We believe that because the jury found the two defendants operated as a single business enterprise, liability was properly assessed against both. The jury answered "yes" to this question with accompanying instructions:

Do you find that Beneficial Personnel Services of Texas, Inc. ('BPS') and Business Staffing, Inc. ('BSI') operated as a 'single business enterprise'?

You are instructed that a single business enterprise exists when two or more organizations associate together and rather than operate as separate business entities, integrate their resources to achieve a common business purpose.

Some of the factors you may consider in determining whether BPS and BSI operated as a single business enterprise or separate business entities are as follows:

Whether or not they had:

a. common employees;

b. common record keeping;

c. centralized accounting;

d. payment of wages by one corporation to another corporation's employees;

e. common business name;

f. services rendered by the employees of one corporation on behalf of the other;

g. undocumented transfers of funds between corporations;

h. unclear allocation of profits and losses between corporations;

i. same officers;

j. same shareholders;

k. same telephone number.

You are not required to find all factors exist to answer "Yes," nor are you required to fail to find any factors exist for a "No" answer. You are merely to consider the above factors in reaching your answer.

The jury was properly instructed on the definition of a single business enterprise and the necessary factors for determining its existence. *Paramount; See George Grubbs Enterprises, Inc. v. Bien,* 900 S.W.2d 337, 339 (Tex.1995). Because the single business enterprise theory is a proper basis for disregarding the corporate structure, the trial court did not err in awarding damages against BSI.[4] *Id.* Contrary to appellants' contention, we hold the single business enterprise theory is a valid means of imposing tort liability on two constituent corporations for damages caused in pursuit of the joint business. *George Grubbs,* 900 S.W.2d at 339 (single business enterprise applied in suit under DTPA and intentional infliction of emotional distress). Points of Error Three and Four are overruled.

### Recovery on Fraud Claim

In Point of Error Five, appellants urge that the trial court erred in entering

---

4. Alternatively, any error has been waived. While arguing his motion for directed verdict, appellants' counsel moved for entry of judgment against BPS on the breach of contract claim. Rey's counsel agreed contingent upon "the final judgment being based on the jury's answer or the Court's determination of a successor or same corporation or a single business entity." The trial court noted that the parties were asking for different things:

I'm hearing you say that the Court should enter judgment that BPS breached the contract.

I'm hearing [Rey's counsel] say that he believes that he's proven that BPS and BSI [ ... ] breached the contract.

After which the following exchange was had:

MR. TRENCHARD: Your Honor, perhaps we can make an agreement that any judgment against BSI is contingent on Court findings and/or jury findings on one of the theories that makes them liable jointly with BPS, and then we can avoid those questions.

MR. STRANGE: I would agree with Mr. Trenchard.

Accordingly, it appears that BSI waived any complaint on liability if the jury made a single business enterprise finding. As we find there was no error, we need not reach the waiver point.

judgment on Rey's fraud claim, as Rey was contractually limited to recovery for breach of contract. Throughout trial, in his appellate brief, and at oral argument, defendants' counsel has maintained that a bright-line rule should be applied here and, impliedly, in all cases involving fraudulent contractual promises. BPS/BSI urge that simply no tort liability can exist where the tort allegations involve obligations under a contract. Defendants contend that, because the fraud against Mr. Rey consisted of false promises made as part of his employment contract, no tort could occur as a matter of law. We believe this is a misreading of the law.

In Points of Error Six, Eight, and Nine, appellants similarly contend that the record does not support the jury's finding that BPS/BSI committed fraud, nor any conclusion that BPS/BSI did more than breach the employment contract, and further claim there was no evidence or insufficient evidence to support a fraud recovery, as any failure to provide benefits as promised constitutes only a breach of the employment contract between BPS/BSI and Rey; thus Rey's complaint that BPS/BSI misrepresented the existence and type of workers' compensation benefits sounds only in contract. In analyzing these points of error, then, we must determine whether this case was properly submitted as fraud, or whether it sounds in contract only. We conclude that the trial court correctly determined that the facts here supported a jury question on fraud.

In answer to question number two, the jury responded "yes" to this inquiry:

> Did Beneficial Personnel Services of Texas, Inc. commit fraud against Ramon Rey with regard to their representations to him concerning the existence and type of workers compensation benefits which would be provided to him?

The trial court properly charged the jury that fraud occurs when: (1) the party makes a material misrepresentation; (2) with knowledge of falsity or made recklessly without any knowledge of its truth and as a positive assertion; (3) made with intent that it be relied upon by the other party; (4) that the party actually relied upon it; and (5) that the party suffer injury. *Trenholm v. Ratcliff,*

646 S.W.2d 927, 930 (Tex.1983); *Stone v. Lawyers Title Insurance Corp.,* 554 S.W.2d 183 (Tex.1977); *State National Bank of El Paso v. Farah Manufacturing Co.,* 678 S.W.2d 661 (Tex.App.—El Paso 1984, writ dism'd by agr.). The trial court likewise properly instructed the jury that a misrepresentation means: (1) a false statement of fact; (2) a promise of future performance made with intent not to perform; (3) a statement of opinion based on a false statement of fact; or (4) an expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion. *Trenholm,* 646 S.W.2d at 930; *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434–35 (Tex.1986); *Eagle Properties, Ltd. v. Scharbauer,* 807 S.W.2d 714, 723 (Tex. 1990).

In arguing that this case sounds only in contract, BPS/BSI relies upon several statements made by our Supreme Court to the effect that, although the contractual relationship between parties may create duties under both contract and tort law, the nature of an injury most often determines whether contract or tort duties have been breached. "When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone." *Southwestern Bell Telephone Co. v. DeLanney,* 809 S.W.2d 493, 495 (Tex.1991), *quoting Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986). This may be true, but we think this doctrine must be carefully applied in fraud cases, particularly fraud cases involving false contractual promises. The same authority upon which BPS/BSI relies also includes this statement:

> The acts of a party may breach duties in tort or contract alone *or simultaneously in both.* DeLanney,* 809 S.W.2d at 495, *quoting Jim Walter Homes,* 711 S.W.2d at 618 [emphasis added].

The line of reasoning urged by BPS/BSI would preclude *any* fraud action involving a contract. We do not believe this is what the Supreme Court intended by the isolated statement in *DeLanney.* Rather, where defendant fraudulently induces plaintiff to enter a contract, clearly a tort action exists. "Fraud in the inducement is fatal to a con-

tract. One induced by fraud may stand to the bargain and recover damages for the fraud or he may rescind." *L & B Oil Co., Inc. v. Arnold*, 620 S.W.2d 191, 193 (Tex.Civ. App.—Waco 1981, writ dism'd); *Polar Bear Ice Cream Co., Inc. v. Earhart*, 603 S.W.2d 388 (Tex.Civ.App.—Waco 1980, writ dism'd); *see Olney Savings & Loan Assoc. v. Trinity Banc Savings Assoc.*, 885 F.2d 266, 276 (5th Cir.1989). In this case, fraud existed if BPS/BSI falsely induced Rey to enter its employment contract by promising workers' compensation benefits, equal to those available under Texas law, that it had no intention of providing. We therefore turn to the question of whether legally and factually sufficient evidence supports the jury's verdict that BPS/BSI fraudulently represented to Rey the existence and type of workers' compensation benefits available to him.

### a. material misrepresentation

■ To recover in fraud, plaintiff must first prove that defendant made a material misrepresentation. Material means that the matter is important to the defrauded party in making a decision: "Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *American Medical International Inc. v. Giurintano*, 821 S.W.2d 331, 338 (Tex.App.—Houston [14th Dist.] 1991, no writ). A misrepresentation may be made in several ways. Here, the jury was correctly told it could find misrepresentation if defendant made a false statement of fact, a promise of future performance made with intent not to perform, a statement of opinion based on false statement of fact, or a false expression of opinion made by one claiming or implying special knowledge. *Trenholm*, 646 S.W.2d at 930; *Spoljaric*, 708 S.W.2d at 432.

■ In this case, the evidence shows that BPS/BSI made a material misrepresentation of the type and existence of workers' compensation benefits it intended to obtain for employees. Rey testified that when the employees were switched from White Well Service to BPS/BSI, they were told "everything was going to be well; that nothing was going to change in regards to the doctors and

things." White Well Service had provided its employees workers' compensation benefits from a subscribing carrier. Rey testified that he thought he would still have workers' compensation benefits available to him if he were hurt on the job.

Noel Porras, a co-employee of Rey's, testified that when the White Well Service employees became BPS/BSI employees, they were told that the workers' compensation benefits were "going to be the same as the one that we used to have."

BPS/BSI's corporate representative, Larry Ashcroft–Smith, testified that although its insurer, Corporate Underwriters, was not licensed to do business in Texas and indeed was under an injunction throughout the relevant time period not to do business in Texas, nevertheless BPS/BSI saw no need to disclose the status of its insurer to White Well Service or its employees. His company represented it would provide exactly the same type of workers' compensation benefits as a licensed insurer would under Texas workers' compensation law. Another BPS/BSI representative, Kenneth Cobb, testified that his company told White Well and its employees that it would provide the same benefits they would receive under Texas workers' compensation law. Harry Sewill, president and CEO of BPS/BSI, testified BPS/BSI knew that people would rely on that representation in deciding to enter BPS/BSI's program: "We told people we would provide workers' compensation benefits as provided by the [Texas Workers' Compensation] Act." Johnny White, owner of White's Well Service, testified that when BPS/BSI approached him about hiring and leasing back his employees, BPS/BSI represented to him that it would have workers' compensation insurance, and he believed this. This was a misrepresentation that he did not discover until later, when several of his former employees were injured and sued White Well in their attempts to obtain the benefits they had been promised. White later sued BPS/BSI for failing to provide workers' compensation benefits equal to those available under state law. White compared his BPS/BSI experience with being "taken in" at the carnival. Materiality was shown.

### b. false

To establish fraud, the material representation must be false when it is made. *Trenholm* 646 S.W.2d at 930. Even where a representation is literally true, if it is used to create an impression that is substantially false, it will satisfy this element. *Farah*, 678 S.W.2d at 681; *Blanton v. Sherman Compress Co.*, 256 S.W.2d 884, 887 (Tex.Civ. App.—Dallas 1953, no writ).

Here, the very documents which set out the contract between BPS/BSI and Rey belie the company's promise to provide the same benefits allowed under the Texas Workers' Compensation Act. BPS/BSI's "Worker's Compensation Policy" specifically states that medical treatment for on-the-job injuries "require that you go to a Doctor authorized by (BPS of Tx/BSI/White Well Service)." This is clearly contrary to the Act, which mandates that "the employee is entitled to the employee's initial choice of a doctor from the commission's list," and provides criteria for allowing an employee to select an alternate doctor. TEX.LABOR CODE ANN. § 408.022 (Vernon Pamph.1996); 28 TEX.ADMIN.CODE § 126.9 (West 1996) (Tex. Workers' Compensation Comm'n, Choice of Treating Doctor and Liability for Payment). The evidence is uncontroverted that BPS/BSI prohibited employees from selecting their own doctors when they were injured at work. The evidence also established that BPS/BSI's risk management director, Ken Cobb, canceled authorization for necessary surgery which delayed Rey's recovery. An employer is prohibited from such meddling under the Act. 28 TEX.ADMIN.CODE § 65.10(1)(I) (West 1996) (Tex. Workers' Compensation Comm'n, Actions by Carrier, Claimant's Attorney, and/or Agent). Moreover, BPS/BSI paid Rey less than one-half of his average weekly wage as a temporary income benefit, rather than the 75 percent he would have received under the Act. BPS/BSI never attempted to pay Rey his impairment income benefits until after Rey filed suit. Such benefits must be paid under the Act once a percentage of permanent disability is established. TEX.LABOR CODE ANN. § 408.121 (Vernon Pamp.1996).[5] The evidence supports the jury's finding that BPS/BSI's assertion it would provide "benefits allowed by the [Texas Workers' Compensation] Act" was false when made. Moreover, the representations about workers' compensation benefits, even if literally true, could be found to create a false impression that employees would possess protections they did not have.

### c. knowledge of falsity or reckless disregard

Plaintiff must prove that defendant either knew that the statement was false at the time it was made or made it as a positive assertion without knowledge of its truth. *Trenholm*, 646 S.W.2d at 930. Clearly, BPS/BSI either knew that it would not provide benefits equal to those available under the workers' compensation act, or made that promise to its potential employees and client companies without any notion of what that obligation entailed. At the time of trial, BPS/BSI had never paid Rey's medical bills for treatment from two doctors. BPS/BSI made no attempt to pay Rey his impairment income benefits until after suit was filed, and even then, the amount paid was less than he would have been entitled to under the Act. Kenneth Cobb testified that BPS/BSI had no procedures in place to insure that its claims adjusters knew how to administer workers' compensation benefits; he admitted that Rey's temporary income benefit was less than Texas law required. Cobb refused to authorize necessary surgery, despite recommendations from Rey's treating physician and the medical case manager hired by his own adjusting company.

---

**5.** Numerous other benefits are available under the Act but would be impossible for any but the largest employer to provide under a private plan. It is undisputed that BPS/BSI did not have any of these protections available through the Act: lifetime medical benefits § 408.021; financial hardship advances § 408.085; subsequent injury find for a second compensable injury § 408.162; exemption of benefits from legal process including garnishment, attachment, judgment, and other actions or claims § 408.201; limitation of percentage and requirement for approval of attorney's fees § 408.221; sanctions against insurance carrier who terminates or reduces benefits without reasonable grounds §§ 409.023–024; services of an ombudsman §§ 409.041–042; and administrative proceedings for settling disputes §§ 410.001–308.

A jury could reasonably conclude that BPS/BSI either had no idea what the Texas Workers' Compensation Act required, and therefore acted recklessly in promising to provide those benefits, or that it never intended to provide those benefits available under the Act. This element of fraud is supported by the evidence.

### d. intent

The defendant must intend its false representation to induce action. *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281 (Tex.1994). While a party's intent is determined at the time the party made the representation, it may be inferred from subsequent acts. *Spoljaric*, 708 S.W.2d at 434. Although failure to perform, standing alone, is not sufficient to establish intent not to perform when the promise was made, it is evidence that may be considered with other facts to establish intent. *Id.* at 435. Slight circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent. *Id.*

Here, the jury's finding of intent is supported by direct testimony by BPS/BSI's corporate representatives: Cobb testified that his company told White Well and its employees that it would provide the same benefits available under Texas Law as part of the total package it sold to its clients, and that BPS/BSI "knew they would rely on that." BPS/BSI made the same representation to all its 300 client companies. Although BPS/BSI made that promise, its own directive to employees stated it would not allow employees to select their own doctors, an impermissible restriction under Texas law. BPS/BSI refused to pay for necessary surgery, delaying Rey's recovery. BPS/BSI purchased insurance from a company prohibited from doing business in Texas. The company made no attempt to audit the claim files returned to it by RMI, despite the highly irregular way RMI's role as claims adjuster ended. The company grossly underpaid weekly benefits, and paid neither impairment benefits nor uncontroverted medical bills until suit was filed. Evidence established that BPS/BSI breached its agreement to pay benefits "under Texas law" in each of these particulars. Evidence of intent is sufficient to sustain the jury verdict.

### e. reliance and injury

Plaintiff Rey was required to demonstrate that he relied upon the fraudulent misrepresentation to his detriment. *Trenholm*, 646 S.W.2d at 931, 933. Rey testified that he relied on the representation that BPS/BSI provided workers' compensation benefits the same as were available under the Act and equal to those he had possessed as an employee of White Well; his co-worker testified that he and everybody else were told and believed the same. BPS/BSI representatives testified they intended their client companies, and employees, to rely on the representation that it would provide benefits commensurate with those available under Texas law. Reliance was uncontroverted.

Finally, plaintiff bore the burden of establishing injury resulting from BPS/BSI's misrepresentation. This he did by showing that he suffered prolonged symptoms because BPS/BSI refused to authorize necessary surgery, damage to his credit reputation when BPS/BSI refused to pay his doctors' bills, that he received significantly less in monetary benefits than he should have received under Texas law, that his family life suffered from the stress he was placed under, and that he was forced to borrow money and to accept food stamps. Injury was established.

### f. pecuniary damage

Finally, BPS/BSI urge that Rey presented no evidence of pecuniary damage, that his only requested damage elements for fraud were mental anguish, damage to credit reputation, and loss of past earnings, and that these are not recoverable for fraud. First, we note that BPS/BSI stipulated its failure to pay benefits in the amounts and in the timely manner it would have been obliged to do under the Act. That these amounts were not submitted for the jury's determination does not mean they were not damages caused by appellants' fraud. Second, the jury award contained $12,000 for lost earnings in the past, which is an element of

pecuniary damage. *See Border Apparel–East, Inc. v. Guadian,* 868 S.W.2d 894, 897 (Tex.App.—El Paso 1993, no writ); *Lucas v. U.S.,* 757 S.W.2d 687, 720 n. 21 (Tex. 1988)(C.J. Phillips, dissenting). BPS/BSI ignores this award in making its argument.

We conclude that there was both legally and factually sufficient evidence to support the jury's fraud finding here, that the jury was properly charged on fraud, and that the damages found were appropriate. Points of Error Five, Six, Eight, and Nine are overruled.

### Requested Jury Instruction Limiting Fraud Considerations

■■■■ In Point of Error Seven,[6] BPS/BSI contend that the trial court erred in refusing their requested jury instruction which read:

> You are instructed that in connection with this question, the misrepresentation, if any, must be separate and apart from any promise made in Ramon's Rey's employment contract. That is to say, the breach of any promise in his employment contract does not constitute a fraudulent misrepresentation.

As set out in the previous discussion, we do not believe BPS/BSI's proposed instruction is an accurate reading of the law. The trial court commits no error in refusing to submit an instruction that is an incorrect statement of the law. Tex.R.Civ.P. 278; *Placencio v. Allied Industrial Int'l, Inc.,* 724 S.W.2d 20, 22 (Tex.1987). As we have discussed, a false promise, intentionally made, is fraud whether it is contained in a contract or not. We overrule Point of Error Seven.

### Exemplary Damages

BPS/BSI attacks the trial court's award of exemplary damages from several angles. In Point of Error Ten, appellants claims that the judgment for exemplary damages was error, as such damages are not available for breach of contract. In Point of Error Eleven, appellants assert that the trial court erred in awarding exemplary damages because there was no finding of exemplary damages resulting from fraud. In Point of Error Twelve, appellant claims that the exemplary damage award was error because plaintiff obtained no finding that BPS/BSI acted wilfully or intentionally to injure plaintiff. Point of Error Eighteen asserts that the trial court's findings on exemplary damages do not support the award as a matter of law. We find each of these arguments to be without merit.

■■■ BPS/BSI argues that exemplary damages should not have been assessed because its behavior constituted only a breach of contract. This contention fails because, as discussed at length above, Rey established that BPS/BSI committed fraud. *Trenholm,* 646 S.W.2d at 933. Defendant's intent to harm or conscious indifference to the rights of others will support an award of exemplary damages. *Spoljaric,* 708 S.W.2d at 436; *Trenholm,* 646 S.W.2d at 933; *Dennis v. Dial Finance & Thrift Co.,* 401 S.W.2d 803, 805 (Tex.1966). We have discussed the evidence supporting the jury's finding that BPS/BSI intentionally induced its employees to enter the employment contract by misrepresenting the company's workers' compensation policy. At the least, this supports a conclusion that BPS/BSI was consciously indifferent to Rey's rights.

A number of specific factual findings made by the trial court and supported by the evidence lead to this conclusion. We adopt the following findings in affirming the trial court's decision to award exemplary damages, pursuant to the Supreme Court's mandate in *Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10, 31–33 (Tex.1994).

> Defendant promised the employees of White Well Service that: it would provide worker's compensation benefits; it had worker's compensation insurance coverage;

---

6. This point of error does not comply with Tex. R.App.P. 74(f). An appellate court has some discretion in deciding whether to choose between deeming a point waived and allowing amendment or rebriefing. *Fredonia State Bank v. General American Life Ins. Co.,* 881 S.W.2d 279, 284 (Tex.1994). Since BPS/BSI has not had the opportunity to rebrief this point of error, we elect to consider its merit rather than deem it waived. *See Inpetco, Inc. v. Texas American Bank,* 729 S.W.2d 300 (Tex.1987).

it would provide benefits identical to benefits required by Texas worker's compensation laws; its worker's compensation insurance coverage would be exactly the same as had been provided when the workers were employed by White Well Service knowing that White Well Service had provided worker's compensation coverage from a licensed insurance company and was a subscriber.

The representations concerning the type of worker's compensation coverage to be provided to the employees were false. These false representations were made knowingly. The employees relied upon and believed these false representations.

Defendant knew that its insurance carrier, Corporate Underwriters, was not licensed in the state of Texas but failed to disclose this fact to White Well Service or its employees. It likewise knew and failed to reveal that the State of Texas had filed suit for and received an injunction against Corporate Underwriters and its adjuster agent, RMI, forbidding them from doing business in Texas. Defendant's then-president, Larry Ashcroft–Smith, saw no problem with this failure to reveal the status of its insurance.

The employment contract and "Worker's Compensation Policy" prepared by defendant are intentionally misleading regarding the type and nature of the worker's compensation benefits provided by defendants.

Weekly benefits, impairments, and medical benefits were being paid directly by defendants. Defendant paid dollar-for-dollar into an account to satisfy benefits for injured employees. Each dollar spent for any type of worker's compensation benefit came from defendant's pocket, thus creating a motive for defendant to avoid paying what it owed.

Defendants intentionally or recklessly underpaid Ramon Rey his weekly benefits by paying less than half the amount due for total temporary disability benefits. Defendants intentionally failed to pay the amount due for permanent impairment benefits. Defendants paid approximately 1/3 what was owed, although they had all the wage records necessary to make the correct calculations.

Defendants did not tender indemnity benefits until June 16, 1994, long after the benefits were due and after suit was filed.

Defendants did not pay over $4,000 in undisputed medical bills for Rey's treatment until shortly before or during trial.

Ken Cobb, risk manager for BPS/BSI, canceled surgery for Rey even though he had no right to do so under Texas law. Defendants failed to authorize surgery for over ten weeks.

Ken Cobb's testimony reflected a callous, uncaring attitude toward Rey, stating that underpayments and mistakes made by their adjusting agent, RMI, were "not our problem."

Mr. Sewill, president of BPS/BSI at the time of trial, stated that he had suspicions on the incompetence of RMI and its underpayment of claims, but BPS/BSI presented no credible evidence that it intended to do anything to remedy underpayments which amounted to fraud on other employees.

An award of exemplary damages was needed to deter defendants from continued claims handling like that engaged in with Rey, to punish defendants for the behavior it displayed in this case, and to motivate defendants to review and remedy underpayments. $550,000 in exemplary damages was an appropriate amount, supported by the evidence.

Although defendants had over 5,000 employees and had given away $700,000 to $800,000 in safety incentives, it claimed it was unable to hire competent insurance adjusters to remedy its underpayment of benefits.

Sewill, the company's president, was evasive and refused to give any direct assurance that BSI would be responsible for the obligations of BPS even though evidence was overwhelming that the two companies are a single business enterprise. This despite evidence that when BPS clients were switched to BSI, they were assured that BSI would honor BPS's obligations.

BPS/BSI still do not have worker's compensation with a company licensed in Tex-

as, but have insurance through another unlicensed Turks and Caicos company.

BPS/BSI continue doing business in the same manner as that which caused Rey's damages, they have given no indication they intend to take meaningful steps to remedy damages caused by underpayments and denial of benefits, they refuse to accept responsibility for the acts of RMI and General Rehabilitation Services, although both companies were clearly being directed by BPS/BSI.

Defendants were not truthful in their sworn testimony at trial. BPS/BSI's own records show that risk manager Ken Cobb canceled Rey's back surgery, which he denied. BPS/BSI were aware of and controlled the actions of General Rehabilitation Services. This intentional dishonesty about critical facts of the case demonstrates disrespect for the judicial system.

The award of exemplary damages was supported by the evidence, by the jury's findings, and by the trial court's findings. Points of Error Ten, Eleven, Twelve, and Eighteen are overruled.

### Award for Damage to Credit Reputation

In Points of Error Thirteen and Fourteen, appellants contend that the trial court erred in entering judgment for past and future damage to credit reputation, urging the evidence was legally and factually insufficient to support an award for injury to credit reputation. Loss of credit is recoverable as actual damages in a suit where the damage to credit was the necessary and usual result of the defendant's action. *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 688 (Tex.1981). Appellants argue that damages for injury to credit reputation has no legal basis in an action for fraud. We disagree. *See Sanchez v. Johnson & Johnson Medical, Inc.*, 860 S.W.2d 503, 511 (Tex.App.—El Paso 1993), *rev'd on other grounds*, No. D–4202, 1995 WL 680899 (Tex. Nov. 16, 1995)(recognizing benefit of bargain and mental anguish damages in a fraud action); *Duval County Ranch Co. v. Wooldridge*, 674 S.W.2d 332, 336 (Tex.App.—Austin 1984, no writ)(extending *Mead* rationale to causes of action involving fraud).

Appellants additionally argue that the only evidence supporting damage to credit reputation was improperly admitted hearsay. Specifically, appellants complain that Rey was allowed to testify that he had been turned down for a loan and that he received collection letters from creditors. Rey contends, however, that these statements are not wholly hearsay, as Rey himself would have personal knowledge of such matters. We agree. Generally, where it appears a witness's testimony is predicated both upon personal knowledge and upon hearsay, the testimony is admissible. *Texas Emp. Ins. Ass'n v. Rogers*, 368 S.W.2d 21, 24 (Tex.Civ.App.—Amarillo 1963, writ ref'd n.r.e.). Here, Rey personally knew he had been turned down for a loan and knew whether he received creditor collection letters.

Appellants contend Rey's self-serving conclusory statements about damage to his credit cannot support a recovery. *Auto. Ins. Co. Of Hartford v. Davila*, 805 S.W.2d 897, 908 (Tex.App.—Corpus Christi 1991, writ denied). In *Davila*, the court reversed the jury's award of loss of credit reasoning "[t]here was no evidence of reports to a credit reporting service, a denial of credit to the couple, or any other result of the action by [defendant]." *Id.* This case is distinguishable from *Davila*, however, because Rey testified that he received several collection letters and was turned down for a loan. *See Paramount Nat'l Life Ins. Co. v. Williams*, 772 S.W.2d 255, 266 (Tex.App.—Houston [14th Dist.] 1989, writ denied)(plaintiff's testimony identifying notice letters from three different bill collectors regarding doctor and hospital bills supported jury's award of damages for loss of credit). Moreover, other independent evidence supports the jury's award on damage to credit. Rey gave his opinion that his credit had been damaged. Rey's wife testified that because BPS/BSI did not pay the medical bills and underpaid Rey, she worried about damage to their credit. She also testified that they did not have bad credit prior to the accident. In addition, appellants formally admitted that $3,900 was owed to Dr. Zeeck as late as 1994. The jury could reasonably infer from this that Rey's

credit was damaged by long-outstanding medical bills.

This evidence is enough to withstand both a legal and factual sufficiency challenge. Points of Error Thirteen and Fourteen are overruled.

### Mental Anguish Award

In Point of Error Fifteen, appellants claim that the trial court erred in entering judgment for past and future mental anguish, as the evidence was legally and factually insufficient to support an award for mental anguish. We have visited this legal issue many times, frequently noting that each case involving a mental anguish award is to be reviewed on its own facts, and that once plaintiff has established some amount of mental anguish the jury's decision as to the amount award in compensation is "virtually unreviewable." *Dillard's Department Stores, Inc. v. Strom,* 869 S.W.2d 654, 659 (Tex.App.—El Paso 1994, writ dism'd by agr.); *Worsham Steel Co. v. Arias,* 831 S.W.2d 81, 85 (Tex.App.—El Paso 1992, no writ); *Skaggs Alpha Beta, Inc. v. Nabhan,* 808 S.W.2d 198, 202 (Tex.App.—El Paso 1991, no writ). The courts have consistently defined mental anguish as:

> [A] relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment, or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair, and/or public humiliation. *Strom,* 869 S.W.2d at 660, *quoting Trevino v. Southwestern Bell Telephone Co.,* 582 S.W.2d 582, 584 (Tex.Civ.App.—Corpus Christi 1979, no writ).

Here, the jury awarded Rey $75,000 for past mental anguish. BPS/BSI challenges the awards on three grounds: (1) because fraud does not usually entail a physical injury, that there must be evidence of physical harm before mental anguish damages may be awarded; (2) the evidence fails to show proximate cause between the fraudulent acts and

mental anguish; and (3) the evidence does not rise to that level of affliction required by Texas law. We disagree on all three counts.

First, we reject BPS/BSI's contention that Rey was required to prove physical injury as a prerequisite to recovery for mental anguish. This contention is simply incorrect. Emotional distress need not manifest itself physically to be compensable. *Boyles v. Kerr,* 855 S.W.2d 593, 598 (Tex. 1993). That Rey's recovery is grounded in fraud does not change the general rule.[7] *Id.* (listing causes of action where mental anguish is not recoverable, not mentioning fraud). This court has specifically upheld awards for mental anguish in fraud cases, and has not required a physical injury in doing so. *Strom,* 869 S.W.2d at 660. This contention is without merit.

We next examine the evidence to determine if Rey's mental anguish was sufficiently tied to BPS/BSI's wrongful acts to establish causation, and if it rises to the level of mental suffering required by the law. We conclude that the evidence is both legally and factually sufficient to support the mental anguish award, and to establish a causal connection. Specifically, the evidence established the following: that after Rey was hurt and had hired a lawyer, he found that he had been cheated by BPS/BSI or its insurer. His doctors were not paid; he was underpaid on weekly wage replacement benefits, and not paid his permanent disability benefits at all. This, although he had done everything his employer and doctors had told him to do. Because of the underpayments, his family was forced to go on food stamps, which they had never had to do before. He had to borrow money from his family, and his brothers would give him used clothes for his children. This made him feel very bad, gave him headaches, caused him insomnia, and made him sick to his stomach. He had pain throughout his body from being upset. The damage to his credit, likewise, upset and hurt him. He worried what he would do if it was necessary to make a major purchase such as a washing machine or refrigerator. His wife

---

7. Moreover, Rey did experience physical manifestations of his mental distress. The evidence established that he suffered headaches, insomnia, and stomach problems.

testified that the family had great difficulties surviving after his injury. They had difficulty paying the rent, they were forced to accept handouts of food and clothing from family and friends, they went on food stamps. These hardships caused her husband to suffer inside, because there was nothing he could do to remedy things. He was sad, slept badly, could not eat, complained of headaches, and pains in his arms and stomach. He was always dwelling on what the family was going through. She saw him crying and with tears in his eyes many times. We find that this testimony is legally and factually sufficient evidence of both the connection of Rey's suffering to BPS/BSI's acts and omissions, and that it rises to the level required by law to sustain the award. Point of Error Fifteen is overruled.

### DTPA Letter

In Point of Error Sixteen, appellants claim that the trial court erred in admitting a letter from Johnny White of White Well Service to BPS/BSI, notifying BPS/BSI of White's belief that BPS/BSI had violated the Texas Deceptive Trade Practices Act, and requesting that they indemnify White for his attorney's fees and any judgments against his company stemming from BPS/BSI's failure to pay compensation benefits. The letter should have been excluded, appellants claim, because its probative value is substantially outweighed by its potential for unfair prejudice and confusion of the issues. In its related Point of Error Seventeen, appellants urge that the trial court erred in refusing to grant a new trial based on newly discovered evidence, as after trial was had in this case, White Well dropped its DTPA lawsuit against BPS/BSI. We find that the trial court was within its discretion in admitting the letter and in denying a new trial.

First, we believe the letter was relevant to the issue of intent in Rey's fraud claim, as well as his claim for exemplary damages. 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. TEX.R.CIV.EVID. 401.

All relevant evidence is generally admissible, unless its probative value is substantially outweighed by the danger of unfair prejudice, or is otherwise proscribed by law. TEX.R.CIV. EVID. 402, 403. The letter, written by White Well Service's attorney demanding reimbursement for attorney's fees and expenses, outlines the representations made by BPS/ BSI to White Well in soliciting its business, that:

> White Well Service would be protected by the Employee Leasing Agreement between BPST and White Well Service and the Employment Agreement between BPST and each employee/plaintiff from claims such as these [for the benefits they would have been entitled to under the Act, or for common law negligence and fraud]. BPST's employees and agents represented to White Well Service that the only claims which these employees would have against White Well Service, in the event of an on-the-job injury, would be for recovery of what each employee would have been entitled to recover under the terms of the Texas Workers' Compensation Act.

> . . .

> [A]t least two courts . . . have found that the Employee Leasing Agreement and the Employment Agreement do not protect White Well Service from liability to the various BPST employees. Therefore, BPST has misrepresented the protection which its services would provide to White Well Service.

This evidence is certainly cogent on the issue of intent to defraud. Although it is hearsay, hearsay was not the basis of BPS/BSI's objection at trial, nor in this appeal, and any error in that regard is waived.

Moreover, the content of the letter is cumulative of other testimony by Johnny White, Noel Porras, and Ramon Rey. All these witnesses testified that a BPS/BSI sales representative told White Well and its employees that BPS/BSI's benefits would be equal to those they had with White Well, and that all responsibilities and rights would be the same as under Texas law. Any error, therefore, was harmless.

Appellants also assert they should have been granted a new trial on newly discovered evidence, as White Well ultimately dismissed its DTPA suit against BPS/BSI. The fatal flaw in this argument is that evidence of the dismissal did not exist at the time this case was tried. White Well did not dismiss its DTPA claims against BPS/BSI until after judgment was entered in this case. Evidence that did not exist before judgment was entered cannot form the basis for a new trial. *Sifuentes v. Texas Employers' Insurance Assoc.*, 754 S.W.2d 784, 787 (Tex.App.—Dallas 1988, no writ). Points of Error Sixteen and Seventeen are overruled.

### *Lost Earnings Award*

In Point of Error Nineteen, appellants contend that the trial court erred in entering judgment for lost earnings as the evidence was factually insufficient to support this element of damage. BPS/BSI urges that Rey's claim for lost earnings can only be based upon the ten week delay in receiving his discogram and back surgery. BPS/BSI argues that Rey's lost earnings for that period equal only $1,950, and that the jury's award of $12,000 for this element of damage is unsupported. We disagree.

In question number three, the jury was asked to ascertain Ramon Rey's damages proximately caused by BPS/BSI's fraud. In response to the element of damage "loss of earnings in the past," the jury assessed $12,000. Past lost earnings are the actual loss of income due to an inability to perform a specific job a party held from the time of injury to the date of trial. This differs from loss of earning capacity, which is a plaintiff's diminished ability to work after the date of trial. *Border Apparel–East, Inc. v. Guadian*, 868 S.W.2d 894, 897 (Tex.App.—El Paso 1993, no writ). The burden of proof for lost earnings is greater than that for loss of earning capacity. *Home Interiors & Gifts, Inc. v. Veliz*, 695 S.W.2d 35, 42 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.); *Bailey v. Merrill*, 582 S.W.2d 489, 490 (Tex. Civ.App.—Beaumont 1979, writ ref'd n.r.e.).

The evidence on this issue was scant, but we find it sufficient to uphold the jury award. Plaintiff testified that he made $9,000 in 1992 before his injury, that he made $17,800 in 1991, and that he averaged $350 to $370 per week doing well servicing. Rey's tax returns for those years were entered in evidence, as was BPS/BSI's "check history report" for Rey from February 14, 1992 to April 7, 1993. It appears from this exhibit that Rey earned $6.25 for regular hours worked and $9.38 for overtime. On his highest earning week reflected by the evidence, Rey grossed $484. There was no evidence of lost benefits with pecuniary value. For the ten weeks between the time his surgery was first scheduled and when it was actually performed, then, the jury could reasonably find that Rey lost earnings of $4,840, not the $1,950 suggested by appellants. (Although BPS/BSI might have been entitled to an offset for the amounts paid in wage replacement, they did not request an offset and that is waived). Moreover, Rey points out that after he returned to work for BPS/BSI in February 1993, the company refused to schedule him for overtime hours, and he was finally forced to quit and seek other employment because he could not support his family on his wages for regular hours only. The jury could reasonably conclude that this was retaliation for claiming the benefits he was entitled to, and that Rey lost overtime earnings of around $7,000 between February 1993 and February 1995, when trial was held in this cause. Point of Error Nineteen is overruled.

### *CONCLUSION*

The trial court committed no reversible error in this case. The judgment is affirmed.