NUMBER 13-98-630-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI


___________________________________________________________________


RIO GRANDE VALLEY GAS CO., ET AL., 
Appellants,


v.



THE CITY OF EDINBURG, TEXAS, Appellee.

___________________________________________________________________


On appeal from the 92nd District Court of Hidalgo County,

Texas.

___________________________________________________________________


O P I N I O N



Before Justices Hinojosa, Chavez and Rodriguez


Opinion by Justice Chavez



 Appellants(1) supplied natural gas to commercial and residential
customers within the city of Edinburg. Some of that gas was sold and
distributed according to the terms of a 1985 franchise granted by the
city for the right to sell and distribute natural gas within the city in
exchange for a 4% fee to be charged on all natural gas sales. In 1996
the city sued appellants, alleging that they had used various means to
evade the 1985 franchise agreement. After a lengthy trial, the jury was
asked to answer questions regarding breach of contract, fraud, tortious
interference with contract, civil conspiracy, "single business enterprise"
and fraudulent use of distinct corporations, and whether the property
of certain appellants constituted a purpresture. Based on the jury's
verdict, judgment was entered awarding the city $6,586,508.69 in
actual damages (including prejudgment interest),(2) $3,518,000 for trial
and conditional appellate attorney's fees, $300,000 in exemplary
damages, post-judgment interest, and costs. We affirm the city's
recovery of lost franchise fees and the award of attorney's fees, but we
remove the damages award for the value of certain lateral pipelines and
the award of exemplary damages. As reformed, we render judgment
that the city recover $774,445.33 in actual damages (including pre-judgment interest), plus $3,518,000 for trial and conditional attorney's
fees.

 For purposes of appeal, the appellants have formed five groups
which have each filed separate briefs, raising dozens of issues. Rather
than attempting to summarize the positions of the parties, we will first
provide a factual overview, and then proceed to examine the parties'
complaints and positions regarding each of the dispositive issues.

Factual Overview

 Effective October 1, 1985 the city entered into a franchise
agreement with Rio Grande Valley Gas Co. (RGVG), granting RGVG the
"right, privilege, and franchise" to supply natural gas to customers
within the city limits. In exchange for this franchise, RGVG was to pay
the city "4% of its gross income derived from all gas sales within the
City of Edinburg." In 1993, RGVG merged with Southern Union Gas Co.
(SU), and SU assumed the franchise.

 RGVG was a subsidiary of Valero Energy Corp. (VEC). RGVG
obtained most of its natural gas supply from Valero Transmission Co.
(VTC), at a set price which RGVG then offered to its customers at a set
price. The prices for consumers were regulated and set by tariffs
approved by the Railroad Commission. The market price, however, was
much lower, and large industrial customers began clamoring for
cheaper gas than was available at RGVG's set rate. In 1986 Reata
Industrial Gas Co. (Reata), another subsidiary of VEC, began selling
deregulated "spot-market" gas, which fluctuated in price according to
the market price, to industrial customers in Edinburg. Eventually other
companies in addition to Reata began supplying spot-market gas to
large industrial customers in Edinburg, but this case deals primarily
with Reata's spot-market sales. 

 Reata owned no pipes for delivering gas, so they contracted with
VTC and RGVG for "transportation" of the gas to industrial customers. 
On paper, Reata's sales took place at designated points of sale outside
of the city limits. However, there were no meters at these designated
points, and the gas was not metered until it arrived at the customers'
premises inside the city limits.

 In 1986 Richard Alamia, then mayor of Edinburg, sent a letter to
the commissioners of the Railroad Commission supporting the
availability of spot-market gas, and mentioning the benefits to the city
of permitting RGVG to purchase some of its gas from Reata. Edinburg
was also a participant in the "Valley Steering Committee," an
organization of cities in the region which addressed issues concerning
natural gas supply, including deregulated spot-market gas. In January
1988 the city adopted an ordinance approving the rate RGVG could
charge for transporting gas within the city. The city also adjusted its
budget to reflect lower anticipated revenue from gas franchise fees after
Reata began supplying the large industrial customers with spot-market
gas.

 In March 1987 RGVG also transferred certain "lateral" pipelines to
VEC. Most of these pipes lay outside the city limits. However, a small
portion were inside the city. The city contends that its franchise
agreement prohibited such a transfer without its approval, and that
under the franchise agreement the city was authorized to purchase the
assets to be transferred if such a situation arose.

Single Business Enterprise & Sham to Perpetrate Fraud

 The jury found that RGVG, VEC, VTC, VNGC, and Reata operated
as a single business enterprise between October 1, 1985 and
September 30, 1993. Based on this finding, these appellants were held
jointly and severally liable for the actual damages assessed against
each. The jury also found that VEC was responsible for the conduct of
RGVG during that same time period because VEC used RGVG to
perpetrate a fraud on the city. Appellants make several arguments
contesting these findings. 

 First, we consider appellants' argument that the only theory of
collective liability pleaded by the city was "alter ego," and that the city
never pleaded "single business enterprise" or "sham to perpetrate a
fraud." In order to support recovery, a petition is required to contain "a
short statement of the cause of action sufficient to give fair notice of the
claim involved." Tex. R. Civ. P. 47(a). The test of the "fair notice"
pleading requirement is whether an opposing attorney of reasonable
competence, with the pleadings before him, can ascertain the nature
and basic issues of the controversy and what testimony will probably
be relevant. Horizon/CMS Healthcare Corp. v. Auld, No. 99-0169, 2000
Tex. LEXIS 88, at *23 (Tex. Aug. 24, 2000); see Tex. R. Civ. P. 45(b). 

 The "single business enterprise" theory is described as analogous
to partnership principles: that when corporations are not operated as
separate entities, but rather integrate their resources to achieve a
common business purpose, each constituent corporation may be held
liable for the debts incurred by the other component entities in pursuit
of that business purpose. Paramount Petroleum Corp. v. Taylor Rental
Ctr., 712 S.W.2d 534, 536 (Tex. App.--Houston [14th Dist.] 1986, writ
ref'd n.r.e.). Factors relevant to determining whether a "single business
enterprise" is present include common employees, common offices,
centralized accounting, payment of wages by one corporation to
another corporation's employees, common business name, services
rendered by the employees of one corporation on behalf of another
corporation, undocumented transfers of funds between corporations,
and unclear allocation of profits and losses between corporations. Hall
v. Timmons, 987 S.W.2d 248, 252 (Tex. App.--Beaumont 1999, no
pet.); Beneficial Personnel Servs. of Tex., Inc. v. Rey, 927 S.W.2d
157,165 (Tex. App.--El Paso 1996, joint writ granted without reference
to merits, remanded for settlement); Paramount, 712 S.W.2d at 536. 
To prove that there has been a sham to perpetrate a fraud, tort
claimants must show only constructive fraud. Castleberry v. Branscum,
721 S.W.2d 270, 273 (Tex. 1986). Constructive fraud is the breach of
some legal or equitable duty which, irrespective of moral guilt, the law
declares fraudulent because of its tendency to deceive others, to violate
confidence, or to injure public interests. Archer v. Griffith, 390 S.W.2d
735, 740 (Tex. 1964).

 The city's live pleading alleged alter ego and "joint enterprise
liability" as "alternative" theories. To establish a "joint enterprise," a
party must show (1) an agreement among the members of the group;
(2) a common purpose; (3) a community of pecuniary interest; and (4)
an equal right to control the enterprise. Shoemaker v. Whistler's Estate,
513 S.W.2d 10, 17 (Tex. 1974), citing Restatement (Second) of Torts
§ 491 cmt. c, (1965).

 The "alter ego" theory applies to disregard the corporate fiction
when the corporation is "organized and operated as a mere tool or
business conduit of another corporation." Centeq Realty, Inc. v. Siegler,
899 S.W.2d 195, 198 (Tex. 1995). "Alter ego" is a separate and
distinct theory from the concept of a "single business enterprise." 
Aluminum Chemicals (Bolivia), Inc. v. Bechtel Corp., 2000 Tex. App.
LEXIS 5188, at *7-8(Tex. App.--Texarkana Aug. 4, 2000, no pet. h.);
George Grubbs Enters., Inc. v. Bien, 881 S.W.2d 843, 859 (Tex. App.--Fort Worth 1994), rev'd on other grounds, 900 S.W.2d 337 (Tex. 1995);
Hideca Petroleum v. Tampimex Oil Int'l, Ltd., 740 S.W.2d 838, 843
(Tex. App.--Houston [1st Dist.] 1987, no writ).

 Specifically, the city's petition alleged that "Defendants acted
jointly to conduct the unauthorized deliveries of gas inside Edinburg"
and that "the Valero Defendants acted through Reata and RGV to
prosecute their own interests and that Reata and RGV were little more
than pawns used to effectuate the desires of the Valero Defendants." 
The city also alleged that "Valero Energy used Valero personnel and the
Valero Defendants to transact supposed 'arms-length transactions' on
behalf of and to the benefit of Valero Energy's common interest," and
"utilized sham agreements . . . to promote this sham." Finally, the city
alleged that "Valero Energy and the Valero defendants . . . conducted a
joint enterprise to supply, transport, sell, and/or deliver gas inside the
City of Edinburg."

 The city's pleadings gave appellants fair notice of its claim of
"sham to perpetrate fraud" and single business enterprise. The city
alleged that appellants had used their various corporate forms as a
deceptive "sham." The city also alleged that the different corporations
were not operated as separate entities, but rather were used "on behalf
of and to the benefit of Valero Energy's common interest," and that the
subsidiary corporations were used as "pawns." Even if the city did not
use the phrases "sham to perpetrate fraud" and "single business
enterprise" in its pleadings, the facts alleged support those causes of
action.

 Support for this holding is found in Klein v. Sporting Goods, Inc.,
772 S.W.2d 173 (Tex. App--Houston [14th Dist.] 1989, writ denied). In
that case, the jury found that the defendant had used the corporate
form as a sham to perpetrate fraud on the plaintiffs. Id. at 175. The
plaintiffs' pleadings did not use the phrase "sham to perpetrate fraud,"
but did allege that the defendant had acted deceptively and used the
corporate form in an attempt to conduct business while avoiding
legitimate debts. Id. at 177. The court held that the plaintiffs'
pleadings gave the defendant adequate notice of the nature and basic
issues of the cause of action. Id.

 Appellants also argue that the "single business enterprise"
doctrine is not recognized in Texas law as a valid means of disregarding
the corporate form. This argument is without merit. Numerous Texas
cases have upheld jury findings on a "single business enterprise"
theory. See, e.g., Fontenot Petro-Chem & Marine Servs., Inc. v.
LaBono, 993 S.W.2d 455, 460 (Tex. App.--Corpus Christi 1999, pet.
denied); Hall, 987 S.W.2d at 252; Paramount Petroleum, 712 S.W.2d
534 at 536. 

 Next, appellants argue that the city could only seek to hold one
corporation liable for the debts of another after showing that it would
be harmed if forced to seek collection of a judgment from only one
defendant. Again, we disagree. Both of the cases relied on by
appellants, Lucas v. Texas Industries, Inc., 696 S.W.2d 372 (Tex. 1984),
and Mancorp, Inc. v. Culpepper, 836 S.W.2d 844 (Tex. App.--Houston
[1st Dist.] 1992, no writ), applied the alter ego doctrine, which is not at
issue in this case. The prospect that a claimant will not be able to
collect a judgment unless the corporate form is disregarded is part of
the justification for doctrines such as alter ego and single business
enterprise. See Lucas, 696 S.W.2d at 374; Mancorp, Inc. v. Culpepper,
802 S.W.2d 226, 228 (Tex. 1990). That does not mean, however, that
a claimant may not pursue theories for piercing the corporate veil at the
same time that basic liability issues are litigated. Countless Texas
cases, including the landmark Texas Supreme Court decision in
Castleberry v. Branscum, allow claimants to litigate underlying liability
issues at the same time and in the same proceeding as veil-piercing
theories. See, e.g., Castleberry, 721 S.W.2d at 271; see also Mancorp,
802 S.W.2d at 227.

 Appellants also contend that the city presented insufficient
evidence to support an alter ego finding. Because the jury was
presented with questions regarding single business enterprise and
sham to perpetrate a fraud, but not alter ego, this point is moot.

 Next, we consider appellants' challenges to the testimony of the
city's expert on corporate structures, Marlane Meyer. Appellants
contend that Meyer's testimony was inadmissible because the city
failed to meet its burden of establishing that Meyer was qualified to give
expert testimony about the matters she testified about, and that her
testimony satisfied the standards for reliability and relevancy of expert
testimony.

 The proponent of expert testimony has the burden of establishing
that the expert is qualified in the field, the testimony is relevant to the
issues in the case and is based on a reliable foundation. E.I. du Pont de
Nemours and Co., Inc. v. Robinson, 923 S.W.2d 549, 556 (Tex. 1995). 
In assessing the reliability of scientific testimony, courts consider
factors such as (1) the extent to which the theory has been or can be
tested; (2) the extent to which the technique relies upon the subjective
interpretation of the expert; (3) whether the theory has been subjected
to peer review and/or publication; (4) the technique's potential rate of
error; (5) whether the underlying theory or technique has been generally
accepted as valid by the relevant scientific community; and (6) the
non-judicial uses which have been made of the theory or technique. Id.
at 557. However, this list of factors for assessing the reliability of
scientific evidence cannot always be used with other kinds of expert
testimony. Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713,
726 (Tex. 1998). In some cases, the Robinson factors will not be
helpful in assessing the reliability of the expert's testimony; rather,
simple observation and experience in the field may suffice. Id. We
review the trial court's decision regarding whether to admit expert
evidence according to an "abuse of discretion" standard. Id. at 727.

 Regarding Meyer's qualifications, appellants argue that Meyer
works as a probate and estate planning lawyer who "admitted to
having no experience with, expertise in, training for, or publications
regarding corporate structure issues involving the natural gas industry,
multi-tiered business entities, municipal franchises, or fraud." 
However, she did testify that she practiced primarily corporate law for
the first 10-12 years of her 22-year legal career, and had represented
approximately one hundred corporations. At the time of trial, 20-25%
of her work was still in corporate law. She acknowledged that she had
never represented a corporation in the natural gas business or a publicly
held corporation. While she had set up multi-tiered corporations, she
had not worked with any multi-tiered corporations the size of the Valero
corporations. She had been involved in litigation involving alter ego
issues before, and regularly advised clients about how to preserve the
liability protections of the corporate form. She had never published any
articles in the corporate law field. Corporate law was not included as
one of her practice areas in her entry in the Texas Legal Directory, but
Meyer testified that this was because she did not want referrals in that
field. She testified that she was not a member of the corporate law
section of the State Bar because she considered the section newsletter
to be the principal benefit of membership and her law partner was a
member of the corporate law section, so she had access to his copy of
the newsletter.(3)

 Appellants rely on Broders v. Heise, 924 S.W.2d 148, 152-53 (Tex.
1996), a case where the Texas Supreme Court held that an emergency
room doctor was not qualified to testify about the specialty of
neurology. Appellants argue that Meyer, as an estate and probate
lawyer, was not qualified to testify about corporations. However, unlike
the emergency room doctor in Broders, Meyer had once concentrated
her practice in the specialty she was testifying about, and continued to
do a portion of her work in that field. Therefore, Broders is not
controlling.

 We conclude that the trial court did not abuse its discretion in
determining that Meyer was qualified as an expert in corporate
structures. Furthermore, the subject of Meyer's testimony was not
particularly scientific, and, therefore, the Robinson factors for
admissibility of scientific evidence cannot be usefully applied in
assessing the reliability of her testimony. Rather, Meyer's testimony
was based on her experience creating and organizing corporations. We
hold that the trial court was also within its discretion in determining
that Meyer's testimony was relevant and reliable.

 Appellants also contend that Meyer's testimony constituted "no
evidence" because her opinions consisted primarily of improper legal
conclusions. An expert may not give an opinion regarding a question
of law, because such issues are not for the factfinder to determine. 
Puente v. A.S.I. Signs, 821 S.W.2d 400, 402 (Tex. App.--Corpus Christi
1991, writ denied). However, an expert may testify to ultimate issues
which are mixed questions of law and fact. Birchfield v. Texarkana
Mem'l Hosp., 747 S.W.2d 361, 365 (Tex. 1987).

 Meyer's testimony consisted primarily of interpretation of various
corporate documents from VEC and its subsidiaries. Meyer also offered
opinions regarding the degree to which these documents indicated that
VEC and its subsidiaries were being operated as one unit rather than as
separate entities. To the extent that Meyer commented on ultimate
issues, those ultimate issues were sufficiently mixed with questions of
fact to permit admission of her testimony. 

 Appellants also argue that the judgment improperly incorporated
the jury's answers to questions 11 and 12 regarding single business
enterprise and whether VEC used RGVG to perpetrate a fraud, because
the city elected not to include in the judgment the jury's answer to
question 5 regarding whether RGVG failed to make payments under the
franchise agreement, and the jury charge instructed the jury that its
consideration of questions 11 and 12 was premised on an affirmative
answer to question 5. Appellants argue that, because disregarding
corporate separateness is a "secondary" theory of recovery, the city was
obligated to obtain a "secondary" finding justifying disregarding
corporate separateness for each cause of action it would ultimately
recover on. 

 We disagree. There is simply no basis in law for requiring the city
to obtain separate single business enterprise findings for each cause of
action. Rather, the single business enterprise finding in question 12
applies to all causes of action. Cf. Aero Energy, Inc. v. Circle C Drilling
Co., 699 S.W.2d 821, 823 (Tex. 1985) (alter ego finding applied to both
causes of action for breach of contract and fraud).

 VEC and its subsidiaries contend that the purchase of RGVG by SU
on October 13, 1993, transferred all liability for RGVG's actions to SU
and absolved VEC and its subsidiaries. However, the jury made
findings that authorized disregarding the separateness of the various
Valero corporations, and we have rejected all of appellants' challenges
to these findings. Therefore, liability for RGVG's conduct was not
limited to RGVG, but extended throughout the Valero corporate family. 


 Finally, appellants contend that, because they became parties to
this lawsuit at different times, those who were added later (Valero
Transmission, L.P.; Reata; Reata, L.P.; and Mercado) should not be
jointly responsible for costs incurred before they became parties to the
suit. Here again, because the jury's findings authorized disregarding
the corporate separateness of the Valero appellants, sharing of costs
between them was appropriate.(4) 

 We conclude that appellants have failed to demonstrate error in
the trial court's determination that VEC, RGVG, VTC, VNGC, and Reata
are jointly and severally liable for the damages assessed against them. Contract Claims

 Questions were submitted to the jury regarding breach of contract
and tortious interference with contract. The jury answered each
question in the city's favor, and appellants challenge the evidence
supporting each of these answers. 

 The city contended that appellants committed a breach of contract
by failing to pay full franchise fees under the franchise agreements and
by transferring the lateral pipelines without the city's consent. The city
also alleged that the transfer of the lateral pipes constituted tortious
interference with the franchise agreement by the grantees of the lateral
pipelines. 

 Appellants contend that only RGVG was a party to the franchise
agreement, and therefore there was no obligation to pay franchise fees
on the spot-market gas sold by Reata. However, because we have held
that the separateness of the various Valero subsidiaries should be
disregarded, the contractual obligations of the franchise agreement
extend throughout the Valero family, and the Valero appellants were
responsible for collecting and paying franchise fees on all Valero gas
sales inside the city, whether the gas was nominally sold by RGVG or
by Reata. 

 Appellants contend, however, that the Reata spot-market sales
were made outside the city limits, with RGVG/SU providing only
transportation service of the gas to customers inside the city limits. The
city contends that the point of sale designation for these sales outside
the city limits was a sham, and that these sales should be considered
as made inside the city limits. 

 John Brickhill, an expert on the gas industry called to testify by the
city, testified that the critical factor for determining where gas should
be considered to be sold is where the gas is metered. In this case, the
spot-market gas sold to the large industrial customers was not metered
until it arrived at the customer's premises inside the city limits. 
Furthermore, for the first few years the industrial customers were
provided with spot-market gas, they were charged only one fee for their
gas, not a separate fee for purchase of the gas outside the city limits
and a separate fee for transportation inside the city limits to their
premises. According to Brickhill, the arrangement whereby the gas
would be considered sold outside the city limits was "just an
accounting gimmick" and "a sham." He concluded that the spot-market
gas should be considered to be sold inside the city limits and, therefore,
subject to the franchise fee.

 Appellants argue that the points of delivery outside the city were
established by unambiguous contracts between Reata and the large
industrial customers. However, Brickhill testified that these contract
provisions were a sham. Such evidence may negate even unambiguous
contract provisions. King v. Fordice, 776 S.W.2d 608, 610 (Tex. App.--Dallas 1989, writ denied) (evidence is admissible to show that a
writing which apparently constituted a contract was a sham and never
intended to constitute an enforceable agreement) (citing Sweet,
Contract Making and Parol Evidence: Diagnosis and Treatment of a Sick
Rule, 53 Cornell L. Rev. 1036, 1039 (1968); and 2 R. Ray, Law of
Evidence (Texas Practice 3d ed.) § 1661 (1980)); see Tarrant County
Water Control and Improvement Dist. Number One v. Fullwood, 963
S.W.2d 60, 64 (Tex. 1998) (contract will not prevent existence of
master-servant relationship where contract is mere sham to conceal the
true legal relationship between the parties).

 Appellants also argue that, because Reata did not own any pipes
inside the city, it had no choice but to contract for transportation
services inside the city limits. However, the fact that Reata had to
contract for some other company to transfer the gas is irrelevant to the
issue of where title to the gas transferred from Reata to the customers. 
RGVG/SU, the transporter of the gas, never assumed title. The
involvement of RGVG/SU to transport the gas in no way necessitated
that title transfer to the customers before it arrived at the customers
premises. We conclude that, based on Brickhill's testimony, the jury
could have determined that Reata's spot-market gas sales occurred
inside the city limits. Because the evidence was sufficient to support
disregarding the corporate separateness between Reata and RGVG, the
obligation to pay franchise fees extended to the spot-market gas "sold"
by Reata and "transported" by RGVG to customers inside Edinburg.

 However, the same reasoning does not apply to gas transported
by SU. SU has no corporate affiliation with Reata or the other Valero
corporations. While the city presented evidence that the arrangement
by which gas was "sold" by one Valero subsidiary (Reata) and
"transported" by another (RGVG) was merely a "sham" to avoid
franchise fees, the same analysis does not apply when the transporter
is outside the corporate family. So long as RGVG was the franchisee,
the obligation to pay a franchise fee extended to sales by Reata inside
the city limits. When SU became the franchisee, this obligation ended.

 The city argues that, because SU made it possible for Reata and
other spot-market sellers to sell gas to customers inside the city, those
other sellers were SU's "assignees" under the franchise agreement. 
However, even if we accept the city's argument that the spot-market
sellers were "assignees" of the franchise agreement, such a holding
would impose a duty to pay franchise fees onto the spot-market sellers
themselves, not onto SU. The city's attempt to make SU responsible for
the sales of its alleged assignees is not supported by the franchise
agreement. The franchise agreement required the "grantee" to pay a
four percent franchise fee on "its gross income derived from all gas
sales within the City of Edinburg." The words "the grantee" were
defined to mean "Rio Grande Valley Gas Company, its successors,
lessees, or assigns, and any individual, co-partnership, corporation,
receiver, or other person or authority owning or operating . . . ." Under
these terms, if the franchise rights were assigned, then the assignee
would be responsible for "its gross income derived from all gas sales
within the City of Edinburg."

 The only gross income SU derived from sales of spot-market gas
inside the city was its transportation revenue. While evidence was
presented at trial establishing that the city had passed a separate
ordinance setting rates and fees for "transportation" of gas, the city did
not seek damages in this litigation for lost transportation fees. 
Therefore, we hold that no evidence supports the city's claims against
SU for breach of the franchise agreement in failure to pay franchise fees.

 For its claim regarding the lateral pipes, the city relies on section
9 of the franchise agreement, which provided:

The Grantee herein [RGVG] may not sell, transfer, or assign
any portion of the rights, privileges, or duties required by this
franchise to be performed by it without the express written
consent of the City of Edinburg first being obtained.


Section 9 further provided that if the franchisee sold "rights, privileges
or duties required to be performed by it" without permission, then 

this franchise shall be considered at an end and the
provisions of SECTION 8 hereof shall apply to the City's right
to purchase the assets of the Grantee regarding any such
sale, transfer or assignment.


Section 8 of the ordinance provided that, if the city chose not to renew
the franchise, the city had an option to purchase "the portion of the
works, apparatus, mains, pipes, meters and supplies . . . that are within
the corporate limits." The jury found that RGVG/SU had sold "rights,
privileges or duties required to be performed by it" without permission,
and that the loss to the city from not exercising its right to buy the
lateral pipes was $4,000,000. However, the trial judge disregarded this
finding and awarded the city $0 in damages related to the transfer of
the lateral pipes. We hold that the city failed to demonstrate a breach
of the franchise agreement in the sale of the lateral pipes.

 The city contends that appellants unlawfully transferred the "right
to own and operate" the lateral pipelines beneath the city's rights of
way. In response, appellants make several arguments, the first being
that the submission of this issue to the jury was not supported by the
pleadings. The city argues that its pleadings did support submission
of this issue, and that appellants waived their complaint by making only
a general "no pleadings" objection that failed to specify how the
proposed question failed to relate to the pleadings. We hold that
appellants did properly object, and that the city's pleadings did not
support submission of this question.

 A party objecting to a charge must point out distinctly the
objectionable matter and grounds of the objection. Tex. R. Civ. P. 274. 
One of the purposes of this rule is to discourage the use of general stock
objections such as "no pleadings." Monsanto Co. v. Milam, 494
S.W.2d 534, 537 (Tex. 1973). In this case, while the attorney for one
appellant made just such a stock "no pleadings" objection, the attorney
for another appellant objected more specifically that "any claim for
breach of Ordinance 1129 under section 8 or 9 is not supported by the
pleadings." The trial judge ordered the attorneys for the various
appellants to adopt the objections of each other defendant so as to
avoid the delay of requiring duplicative objections. This had the effect
of making the objections of each apply to all. See Owens-Corning
Fiberglas Corp. v. Malone, 916 S.W.2d 551, 556 (Tex. App.--Houston
[1st Dist.] 1996), aff'd, 972 S.W.2d 35 (Tex. 1998) (trial court may
permit joint objections to save time); Celotex Corp. v. Tate, 797 S.W.2d
197, 202 (Tex. App.--Corpus Christi 1990, no writ) (same).

 While the city's pleadings did allege tortious interference with
contract, the pleadings never referred to the lateral pipelines or the
provisions of section 8 or 9 of the franchise agreement. The city's
pleadings alleged that the appellants engaged in and provided access
for unauthorized gas sales within the city. Although the jury charge
asked the jury to assess damages based on the value of the lateral
pipelines, the only damages asserted in the pleadings were lost
franchise fees. As discussed in the section of this opinion dealing with
the city's "single business enterprise" and "sham to perpetrate fraud"
claims, the test for determining whether the city's pleadings were
sufficient is whether an opposing attorney of reasonable competence,
with the pleadings before him, can ascertain the nature and basic
issues of the controversy and what testimony will probably be relevant. 
Horizon/CMS, 2000 Tex. LEXIS 88, at *23; see Tex. R. Civ. P. 45(b). 
With no reference whatsoever in the city's pleadings to the lateral pipes
or section 8 or 9 of the franchise agreement, the city's pleadings failed
to give appellants fair notice, and this issue should not have been
submitted to the jury. Because the trial court disregarded the jury's
answer regarding damages arising from the tortious interference
question, we hold that the trial court's judgment was correct in this
regard.(5)
 

Amount of Lost Franchise Fees

 The jury found that RGVG and/or SU violated the franchise
agreement memorialized in Edinburg ordinance 1129 "with respect to
payments due under the ordinance." The jury determined that the
amount of unpaid franchise fees was $584,517.26 for the period when
RGVG held the franchise, and $235,258.74 for the subsequent period
when SU held the franchise. The city's evidence regarding the amount
of lost franchise fees was presented primarily during the testimony of
Carol Freedenthal, whom the city offered as an expert on the energy
industry and economic damages within the context of the energy
industry. 

 Appellants argue that Freedenthal's testimony should be
disregarded because Freedenthal was not an expert on economic issues
and relied on an untested methodology in calculating the city's
damages. Freedenthal's degree was in chemical engineering, but he
testified that he had been doing "economic analysis" "ever since I got
out of college." Freedenthal testified that he was a widely-published
writer about pricing in the natural gas field and had testified as an
expert witness several times. Although he had never testified about
damages from a franchise agreement before, he had testified about
contractual damages in the natural gas industry. Freedenthal was also
a member of the "International Association of Energy Economists."

 Freedenthal testified that he calculated the franchise fees by
finding the volumes of gas sold from various records and then applying
prices he determined to be reasonable based on his experience in the
natural gas field to estimate gross sales. From gross sales he
determined what the 4% franchise fee would be, and compared that
figure to the amount actually paid. He testified, and we agree, that the
appellants' expert used essentially the same methodology as he did,
only the two experts differed regarding which prices should apply and
which figures to include as sales for which a franchise fee was owed. 
Freedenthal concluded that the total amount of missing franchise fees
was $4.74 million.

 Appellants argue that "Freedenthal acknowledged that he had no
experience with the damages model he and the City prepared for this
case, and that he was employing a new and untested methodology." 
We disagree with this characterization of Freedenthal's testimony. 
Freedenthal's "model" was simply to determine the volume of gas sales
that he believed should have been subject to the franchise agreement,
determine the prices for those sales, and use those figures to determine
what the 4% franchise fee would be. Freedenthal testified that he had
used this approach many times, but that this was the first time he had
used it to calculate franchise fees. 

 Appellants also argue that "Freedenthal testified that his damages
model was crafted solely for purposes of this litigation." We do not
agree that Freedenthal ever testified as such. Even if he had, the
purpose of his damages model was to determine damages when a
contract had been breached. It is difficult to imagine what purpose
such a model might have other than litigation on the contract. Under
circumstances such as these, the fact that a certain methodology was
crafted solely for purposes of litigation should not weigh heavily against
the admissibility of testimony based on the analytical model.

 Appellants argue that Freedenthal's sales estimates should be
disregarded because his calculations were based on "wholly fictitious
gas prices" and gas sales volumes that were based, in part, on
estimation. With regard to the prices, appellants fault Freedenthal for
applying the higher prices from the regulating tariffs instead of the spot-market price. Freedenthal conceded that the prices actually paid were
lower than the tariff prices he used in his calculations.

 The city argues that the reason Freedenthal did not use the actual
sales prices is because the actual sales prices did not include the fee for
transporting the gas. However, this argument does not comport with
Freedenthal's testimony. Freedenthal testified that, for the spot-market
gas in question, ". . . the pricing became a two-part element. You have
a transportation allowance and a commodity." This answer reflects
that Freedenthal considered the transportation fee to be part of the sales
prices. Freedenthal also testified that the tariff prices he used were
higher than the commodity price and transportation price combined. 
Freedenthal explained that he used the tariff prices because "that
represented the lost value to the city."

 Clearly, Freedenthal's reason for using the tariff prices was not to
factor in the transportation fee, but that he considered the tariff prices
to be the correct price for Reata's sales. We agree that the price
Freedenthal's factored into his calculations was the correct price. 
Because Reata was not a legitimately separate corporation from RGVG,
RGVG's obligation to sell gas at the tariff prices extended to Reata. 
Therefore, Freedenthal was correct in applying the tariff prices to
Reata's sales for the period when RGVG was the franchisee obligated
to sell gas at tariff prices. In any event, the jury awarded only $819,776
in damages for lost franchise fees, considerably less than the $4.74
million estimated by Freedenthal. We hold that sufficient evidence
supported the damages finding for lost franchise fees on gas sold by
Reata and transported by RGVG. Fraudulent Inducement to Contract

 Appellants argue that the city should not have been permitted to
recover on a cause of action for fraudulent inducement into the
franchise agreement because the city failed to plead it. We agree.

 The Texas Supreme Court has indicated that fraudulent
inducement is really only a simple fraud claim. See DeSantis v.
Wackenhut Corp., 793 S.W.2d 670, 688 (Tex. 1990); Balogh v. Ramos,
978 S.W.2d 696, 701 (Tex. App.--Corpus Christi 1998, pet. denied). 
The elements of fraud and fraudulent inducement, applicable here, are
(1) a material misrepresentation, (2) which was false, and (3) which
was either known to be false when made or was asserted without
knowledge of the truth, (4) which was intended to be acted upon, (5)
which was relied upon, and (6) which caused injury. Id.

 The city did plead a fraud cause of action, but the city's pleadings
had nothing to do with fraudulent inducement into the franchise
agreement. Under its fraud cause of action, the city alleged that the
appellants had sold spot-market gas without collection or payment of
franchise fees and concealed these sales from the city. According to the
city's fraud pleadings, every time the appellants made a franchise
payment to the city without including franchise fees from the spot-market sales, appellants perpetrated a fraud or constructive fraud on the
city. None of the allegations in the city's pleadings mention any fraud
occurring at or before the time the parties agreed to the franchise
agreement. The words "induce" or "inducement" do not appear
anywhere in connection with the city's fraud allegations. We conclude
that the city's pleadings failed to provide appellants with fair notice that
the city would pursue a cause of action for fraudulent inducement, and
the trial court erred in entering judgment on this cause of action. See
Tex. R. Civ. P. 47(a), 45(b); Horizon/CMS, 2000 Tex. LEXIS 88, at *23. 
Therefore, we will remove the $300,000 award of exemplary damages
that was premised on the fraudulent inducement cause of action.

Waiver, Estoppel, and Ratification 

 Questions were submitted to the jury regarding whether the city
was barred from asserting its claims due to waiver, estoppel, or
ratification of the appellants' conduct. The jury answered each of these
questions in the city's favor, and appellants now argue that these
defenses were established as a matter of law. 

 Waiver is an affirmative defense that may be asserted against a
party who intentionally relinquishes a known right or engages in
intentional conduct inconsistent with that right. Tenneco Inc. v.
Enterprise Prods. Co., 925 S.W.2d 640, 643 (Tex. 1996). Silence or
inaction, for so long a period as to show an intention to yield a known
right, may be proof of waiver. Id. Estoppel arises where, by fault of
one, another is induced to change his or her position for the worse. 
Herschbach v. City of Corpus Christi, 883 S.W.2d 720, 736 (Tex. App.--Corpus Christi 1994, writ denied). Ratification occurs when a party
continues to accept benefits under a transaction or conducts itself so as
to recognize the transaction as binding. Arroyo Shrimp Farm, Inc. v.
Hung Shrimp Farm, Inc. 927 S.W.2d 146, 151-52 (Tex. App.--Corpus
Christi 1996, no writ). However, when a person accepting benefits
does not have knowledge of all material facts, ratification or estoppel
cannot ensue. Herschbach, 883 S.W.2d at 737.

 The jury instructions on "ratification" were substantially correct in
relation to the definitions above. The instructions on "waiver" and
"estoppel," however, asked the jury to determine whether

1. The City of Edinburg


 a. by words or conduct made a false representation or
concealed material facts, 


 b. with knowledge of the facts or with knowledge or
information that would lead a reasonable person to
discover the facts, and


 c. with the intention that Rio Grande Valley Gas
Company would rely on the false representation or
concealment in acting or deciding not to act; and


2. Rio Grande Valley Gas Company


 a. did not know and had no means of knowing the real
facts and


 b. relied to its detriment on the false representation or
concealment of material facts.


 Appellants did not object to these instructions. Therefore, we are
required to evaluate the sufficiency of the evidence according to the
instructions given to the jury, regardless of how much those
instructions may have varied from the proper legal meanings of the
terms "waiver" and "estoppel." Kolster v. City of El Paso, 972 S.W.2d
58, 59 (Tex. 1998); Larson v. Cook Consultants, Inc., 690 S.W.2d 567,
568 (Tex. 1985).

 Under the instructions given the jury, appellants are unable to
establish waiver and estoppel as a matter of law. There is simply no
evidence, let alone conclusive evidence, that the city "made a false
representation or concealed material facts." Appellants do not point to
any false representation or concealment of material facts, and our
review of the record reveals none. Instead, appellants focus their
argument on the traditional elements of waiver, estoppel, and
ratification, which do not require a showing of a false representation or
concealment of material facts. By failing to attack the jury's answer on
the terms submitted to the jury, appellants' arguments fail. Id.

 Even if we were to evaluate the sufficiency of the evidence
according to proper definitions of waiver and estoppel, appellants'
arguments still fail, for the same reason that their arguments regarding
ratification fail. Appellants argue that they presented evidence to
conclusively establish that the city knew Reata was selling spot-market
gas "transported" by RGVG to customers inside Edinburg, and that the
city approved of this practice. There is, in fact, a great deal of evidence
that the city was aware of the spot-market gas sales, and that, rather
than demanding a franchise fee on these sales, the city supported these
sales. Appellants correctly insist that the city's franchise did not
prevent other entities selling gas to customers inside the city limits. 
Tex. Const. art. I, § 26; see Clear Lake City Water Auth. v. Clear Lake
Utils. Co., 549 S.W.2d 385, 391 (Tex. 1977) (water authority could not
bind itself to single water supplier); see also City of Brenham v.
Brenham Water Co., 4 S.W. 143, 156 (Tex. 1887) (exclusive privilege for
supply of water was unconstitutional). 

 However, we have held that legally and factually sufficient
evidence supported the jury's finding that Reata, RGVG, and the rest of
the Valero corporate family were in fact not separate entities, but rather
that the obligations and actions of each corporate subsidiary should be
imputed throughout the Valero corporate family. There is no evidence
that the city knew that the Valero corporations were not being
conducted as separate entities. Without evidence of such knowledge,
appellants' waiver, estoppel, and ratification defenses all fail. See
Tenneco v. Enterprise Prods., 925 S.W.2d at 643 (waiver is intentional
relinquishment of known right); see also Herschbach, 883 S.W.2d at
737 (defenses of ratification and estoppel require showing that a person
accepting benefits under agreement has knowledge of all material
facts).

Primary Jurisdiction and the Filed Rate Doctrine

 Appellants claim that the trial court was without jurisdiction to
consider this appeal under the "primary jurisdiction" and "filed rate"
doctrines. The doctrine of primary jurisdiction applies where there is a
question of jurisdiction between a court and an administrative agency. 
American Pawn and Jewelry, Inc. v. Kayal, 923 S.W.2d 670, 673 (Tex.
App.--Corpus Christi 1996, writ denied). Where some parts of the case
are within the exclusive jurisdiction of the agency, primary jurisdiction
lies with the agency. Foree v. Crown Central Petroleum Corp., 431
S.W.2d 312, 316 (Tex. 1968); State Bar of Tex. v. McGee, 972 S.W.2d
770, 773 (Tex. App.--Corpus Christi 1998). Because the purpose of the
doctrine is to assure that the agency will not be bypassed on what is
especially committed to it, and because resort to the courts is still open
after the agency has acted, the doctrine applies even if the agency is
powerless to grant the relief sought, but does have authority to make
incidental findings necessary to the granting of relief in a later judicial
action. Id. 

 Under the "filed rate" doctrine, a filed tariff has the effect of law
governing the relationship between the utility and its customers. Entex,
a Div. of Reliant Energy Resources Corp. v. Railroad Comm'n of Tex., 18
S.W.3d 858, 863 (Tex. App.--Austin 2000, pet. filed); Southwestern Bell
Tel. Co. v. Metro-Link Telecom, Inc., 919 S.W.2d 687, 692 (Tex.
App.--Houston [14th Dist.] 1996, writ denied).

 First, appellants argue that the Gas Utility Regulatory Act assigns
primary jurisdiction over the "rates, operations, and services" of a gas
utility to within the municipality, see Tex. Util. Code Ann. §103.001
(Vernon 1998), and that any appeal of a municipal order on such a
matter is to the Railroad Commission. See Tex. Util. Code Ann.
§103.051 (Vernon 1998). However, appellants cite no authority
indicating that a municipality is empowered to adjudicate its own claim
that a gas utility has breached a franchise agreement. Indeed, this
result is not supported by precedent. See Reo Indus., Inc. v. Natural
Gas Pipeline Co. of Am., 932 F.2d 447, 457 (5th Cir. 1991) (primary
jurisdiction did not lie with Railroad Commission because Commission
has no jurisdiction to settle contractual dispute or award damages); see
also Biskamp v. General Crude Oil Co., 452 S.W.2d 515, 517 (Tex. App.--San Antonio 1970, writ ref'd) (primary jurisdiction did not apply
because Railroad Commission had no authority to interpret contract).

 With regard to the "filed rate" doctrine, appellants argue that in
passing an ordinance setting rates for transportation the city accepted
the transportation practices of RGVG/SU, and, by this lawsuit, the city
improperly attempted to alter the terms of the "filed rate" for
transportation as embodied in the city's ordinance. However, with
regard to RGVG, we have held that the city presented sufficient
evidence to establish that RGVG's "transportation" was actually gas
sales, subject to the franchise agreement the same as RGVG's sales that
did not involve "transportation." With regard to SU's transportation, we
have held that SU does not owe any franchise fees other than those
established in the transportation ordinance. Therefore, our opinion is
unchanged by appellants' arguments concerning the filed rate doctrine.

"Most Favored Nations" Clause

 By way of a pre-trial motion for partial summary judgment, the city
argued that SU should have to pay a franchise fee exceeding 4%, based
on a "most favored nations" provision in the franchise agreement. The
"most favored nations" provision stated

In the event the Grantee [RGVG/SU] should pay any other
municipality which it serves a greater percentage than four
(4%) percent of its said gross receipts, the Grantee hereby
agrees that this franchise shall automatically be amended to
provide for the payment of such higher percent to the City of
Edinburg . . . The city appeals the trial court's denial of this motion. As a general
rule, appellate courts do not have jursidiction to hear denied motions for
summary judgment on appeal. Ackermann v. Vordenbaum, 403 S.W.2d
362, 365 (Tex. 1966); Hines v. Commission for Lawyer Discipline, 28
S.W.3d 697, 700 (Tex. App.--Corpus Christi 2000, no pet. h.);
Highlands Mgmt. Co. v. First Interstate Bank of Tex., N.A., 956 S.W.2d
749, 752 (Tex. App.--Houston[14th Dist.] 1997, pet. denied).

 After the motion was denied, the city did not present nor attempt
to present evidence to show what percentage franchise fees SU paid to
other municipalities, or what additional franchise fees were owed to the
city of Edinburg based on the appropriate higher percentage. Therefore
nothing is preserved for appeal. Appellees' point of error is overruled.

Attorney's Fees

 Appellants also challenge the award of attorney's fees to the city. 
The city sought attorneys' fees based on Texas Civil Practice and
Remedies Code section 37.009, which authorizes attorney's fees for
declaratory relief, and section 38.001(8), which authorizes attorney's
fees in a breach of contract action. 

 Appellants argue that the city was not entitled to recover
attorney's fees on the breach of contract action because (1) the city's
breach of contract claims are not valid; (2) the city recovered nothing
under its breach of contract claims; (3) several of the Valero entities held
jointly liable for the attorney's fees were not parties to the franchise
agreement; (4) the jury question regarding attorney's fees was premised
on a jury question that asked only whether RGVG/SU had breached the
franchise agreement; (5) the city made no pretrial demand on VEC or
VNGC, as required by section 38.002; and (6) the city failed to present
proper evidence of its attorney's fees. We have already ruled on most
of these arguments. We have held that the city's breach of contract
claims are valid. We have also held that the city's arguments for
disregarding the corporate separateness of the various Valero
corporations are valid; therefore, arguments (3), (4), and (5) have also
already been disposed of.

 Appellants' argument that the city recovered nothing under its
breach of contract claim hinges on its argument that the city failed to
properly elect between the jury's damages findings. The jury found that
the damages resulting from fraudulent inducement to contract and
breach of contract were both $584,517.26. The actual damages
awarded included a single award of $584,517.26. Because the city
recovered exemplary damages, which are available for fraudulent
inducement,(6) but not for breach of contract,(7) appellants argue that the
city must have chosen to recover this sum under its fraudulent
inducement claim and chosen to decline recovery under the breach of
contract claim. However, we have held that the city is not entitled to
recover on its cause of action for fraudulent inducement to contract. 
Therefore, we look only to the breach of contract claim in evaluating the
attorney's fees awards.

 Appellants also challenge the evidence supporting the city's claim
for attorney's fees. Appellants claim that the city's evidence was, in
legal effect, no evidence, because the city's attorneys failed to keep
contemporaneous time records and because the city never actually paid
any attorney's fees. They also challenge the summaries that the city's
expert on attorney's fees, Craig Smyser, based his testimony on. 
Appellants complain that the summaries constituted hearsay
information of which Smyser had no personal knowledge. Appellants
also contend that the summaries were inadequate because, while they
summarized the time spent on each task and the time spent by each
attorney, they did not specify which attorneys had done which tasks. 
Appellants contend that the summaries were "riddled with patent
inaccuracies and discrepancies which rendered them wholly unreliable
and competent as evidence," and that the city failed to segregate the
attorney's time between claims. Appellants also contend that the
summaries were "grossly inflated." Appellants also complain that the
city failed to supplement Smyser's deposition as required by Texas Rule
of Civil Procedure 166b(6) to inform them of testimony Smyser would
offer at trial that he did not present at the deposition.

 We are unable to evaluate the merit of appellants' objections that
Smyser's testimony exceeded the scope of his deposition because
appellants have not identified where in the record Smyser's deposition
can be found. The clerk's record in this case is more than 8000 pages
long, and the reporter's record fills 181 volumes. It has never been
considered part of an appellate court's duties in conducting judicial
review to search the record to determine where, or even if, a document
is present. Tex. R. App. P. 38.1(h); Fredonia State Bank v. General Am.
Life Ins. Co., 881 S.W.2d 279, 283 (Tex. 1994). This argument is
waived. Id.

 Appellants' argument that the summaries were inaccurate and
inflated is also waived due to inadequate citation and briefing. 
Appellants' brief states that the summaries are inaccurate and inflated,
and cites only to the place in the record where the summaries are to be
found, without offering any argument or citing to anything in the record
to explain how the summaries are inaccurate and inflated. This
argument is also waived. Tex. R. App. P. 38.1(h).

 Next, we consider appellants' challenge concerning Smyser's use
of summaries on the ground that they were prepared by someone else,
summarizing information of which Smyser had no personal knowledge. 
Appellants rely on Red Top Taxi Co. v. Snow, 452 S.W.2d 772 (Tex. Civ.
App.--Corpus Christi 1970, no writ). In that case, we held insufficient
an expert's testimony that physical therapy provided by another was
necessary and the charges were reasonable. We removed the award
of fees for physical therapy because the testifying expert lacked
personal knowledge that the treatment was provided by the therapist
listed on the bill, or knowledge of how many times the therapist had
seen the patient. Id. at 779.

 However, in a subsequent opinion we stepped back from such
stringent requirements and allowed the trial court greater discretion in
awarding attorney's fees. In Richard Gill Co. v. Jackson's Landing, 758
S.W.2d 921, 927 (Tex. App.--Corpus Christi 1988, writ denied), we
upheld an award of attorney's fees based on testimony from a witness
who lacked personal knowledge of the time spent on the case or the fee
charged. In the instant case, the expert testified based on summaries
of the attorney's time. Although appellants argue that these summaries
were not competent evidence, an expert may rely on data that is not
admissible in evidence if it is of a type reasonably relied on by experts
in the particular field. Tex. R. Evid. 703. 

 Appellants also challenge Smyser's reliance on the summaries
because the summaries do not reflect that the city's attorneys kept
contemporaneous time records, or specify which attorney performed
which specific tasks. However, the absence of contemporaneous time
records did not prevent us from upholding the award of attorney's fees
in the Richard Gill case,(8) and it should not do so here. Although
contemporaneous time records can be beneficial in assessing a claim
for attorney's fees, they are not required.(9) Furthermore, while the
summaries did not specify which tasks were performed by which
attorneys, the summaries did indicate the total amount of time spent by
each attorney. We conclude that the summaries relied on by Smyser
were not so deficient as to render his testimony "no evidence." 

 Next, we consider appellants' argument that the city failed to
segregate those attorney's fees attributable to claims that permit
recovery of attorney's fees from those attorney's fees attributable to
claims that do not permit recovery of attorney's fees. The city argues
that its claims were so interwoven that it should be permitted to recover
all attorney's fees. A plaintiff seeking attorney's fees is required to
show that the fees were incurred while suing the defendant sought to
be charged with the fees and to distinguish between fees attributable
to claims which allow recovery of attorney's fees and fees not
attributable to claims which allow recovery of attorney's fees. Stewart
Title Guar. Co. v. Sterling, 822 S.W.2d 1, 10 (Tex. 1991). An exception
to this rule applies when the claim permitting attorney's fees is so
interrelated with other claims that their prosecution entails proof of
essentially the same facts. Id. at 11.

 The segregation of attorney's fees issue in this case is similar to
the segregation of attorney's fees issue in Pegasus Energy Group, Inc.
v. Cheyenne Petroleum, 3 S.W.3d 112 (Tex. App.--Corpus Christi 1999,
pet. denied). In that case, a gas and oil well operator brought causes
of action for breach of contract, fraud, negligent misrepresentation, and
fraudulent concealment arising from disputes concerning the
management of a well. The defendant also filed a counter-claim
alleging breach of contract. We held that the plaintiff's claims and
defenses to the defendant's counterclaim all arose from the ongoing
management of the well, and were, therefore, sufficiently interrelated
as to excuse the plaintiff from segregating the attorney's fees. Id. at
131.

 In this case, all of the city's claims arise from the franchise
agreement and the appellants' efforts to provide spot-market gas to
industrial customers inside Edinburg without paying franchise fees. 
Although the city brought multiple theories of recovery and sued
multiple parties, all of the causes of action are dependent on the same
set of facts and circumstances, thus making the claims arising from
those same facts inseparable and excusing the city from segregating its
attorney's fees. See Stewart Title v. Sterling, 822 S.W.2d at 11.

 Finally, we consider appellants' contention that the fees awarded,
approximately $2.9 million for the trial, and up to $3.5 million through
all appeals, are excessive in relation to the actual damages awarded,
which we reform to be $584,517.26 before adding pre-judgment
interest. Among the factors in determining the appropriate size of an
award of attorney's fees are the amount involved and the results
obtained. Arthur Andersen, 945 S.W.2d at 818. Attorney's fees must
be reasonable under the particular circumstances of the case and must
bear a reasonable relationship to the amount in controversy. U.S. Steel
Corp. v. Whitley, 636 S.W.2d 465, 470 (Tex. Civ. App.--Corpus Christi
1982, writ ref'd n.r.e.). 

 Appellants do not dispute that this was a case of extraordinary
complexity. They contend, rather, that, regardless of the case's
complexity, the city should not recover attorney's fees that are several
times the amount of actual damages. However, the amount of
damages is only one factor to be considered. Gilbert v. Pettiette, 7
S.W.3d 895, 898 (Tex. App.--Houston [1st Dist.] 1999, no pet.); Texas
Fed. Sav. & Loan Ass'n v. Sealock, 737 S.W.2d 870, 884 (Tex. App.--Dallas 1987, rev'd on other grounds, 755 S.W.2d 69 (Tex. 1988)); 
Murrco Agency, Inc. v. Ryan, 800 S.W.2d 600, 607 (Tex. App.--Dallas
1990, no writ); Braswell v. Braswell, 476 S.W.2d 444, 446 (Tex. Civ.
App.--Waco 1972, writ dism'd). As previously noted, the filings in this
case produced a clerk's record of more than 8000 pages. The seven-
week trial produced a reporter's record of 181 volumes. The defendants
utilized thirty-three different lawyers from ten law firms in preparing
this case. The city's attorneys documented the amount of time
expended and the activities that time was used on; in fact, the figure
urged by the city for its attorney's fees was $1 million more than was
awarded by the jury. Given the complexity of this case and the
evidence of the extraordinary amount of work expended in preparing
and trying the case, we hold that sufficient evidence supported the
attorney's fees awarded.

Purpresture

 The judgment contained a decree that certain lateral pipelines
owned by Valero Transmission, L.P. (VTLP) constitute a purpresture. 
A purpresture is an encroachment without consent upon public rights,
property, or easements, or the appropriation for private use of that
which belongs to the public. Hill Farm, Inc. v. Hill County, 436 S.W.2d
320, 321 (Tex. 1969). 

 The city argues that it gave its consent for pipeline ownership in
the public right-of-way only to RGVG, and that it did not consent to the
transfer of the pipelines away from RGVG and eventually(10) into the
hands of VTLP. Valero Transmission, L.P., is the successor of VTC. We
have already upheld the jury's finding that RGVG and VTC were
operated as a single business enterprise, and that this single business
enterprise finding has the legal effect of extending RGVG's rights and
obligations throughout the Valero family. While this finding helped
support the city's claim for franchise fees on sales from other Valero
corporations, it defeats the city's claim that VTLP had no right to own
pipelines inside the city. Because VTC, predecessor in interest to VTLP,
was operated as a single entity with RGVG, VTLP had the same rights
to own pipelines as RGVG. We hold, therefore, that no evidence
supported the finding that the specified VTLP pipelines constitute a
purpresture, and render judgment that VTLP's ownership of these
pipelines does not constitute a purpresture.

Conclusion

 We modify the trial court's actual damages award and render
judgment that the city of Edinburg recover $584,517.26 in actual
damages, plus $189,928.07(11) in pre-judgment interest, from Rio Grande
Valley Gas Company, Valero Energy Corporation, Valero Transmission
Company, Valero Natural Gas Co., and Reata Industrial Gas Company,
jointly and severally. We affirm the trial court's award of $3,518,000 for
trial and conditional appellate attorney's fees, for which Rio Grande
Valley Gas Company, Valero Energy Corporation, Valero Transmission
Company, Valero Natural Gas Co., Reata Industrial Gas Company, and
Southern Union Company are jointly and severally liable. We reverse
the damages assessed against Mercado Gas Services, Inc. and render
judgment that Edinburg recover nothing from Mercado, and reverse the
judgment's award of actual damages against Southern Union Company.


 MELCHOR CHAVEZ

 Justice


Publish.

Tex. R. App. P. 47.3.


Opinion delivered and filed this

the 21st day of December, 2000.

1. Although both the plaintiffs at trial and the defendants at trial
appealed from the trial court's judgment, most of this opinion concerns
issues raised by the defendants at trial, Rio Grande Valley Gas Co.,
Valero Energy Corp., Valero Transmission Co., Reata Industrial Gas, L.P.,
Southern Union Gas Co., Mercado Gas Services, Inc., Valero Natural
Gas Co., Valero Gas Marketing Co., and Reata Industrial Gas Co. When
the term "appellants" is used in this opinion, that term refers to the
parties who were defendants at trial. When this opinion addresses the
issues raised by the city of Edinburg in its appeal, it will be referred to
simply as "the city."
2. Different appellants are liable for different amounts. The figures
given in the introductory paragraph are cumulative figures for all of the
appellants.
3. After testimony was closed, appellants sought to introduce into
evidence a document to show that Meyer's partner was not a member
of the corporate law section, and therefore would not receive its
newsletter. This document was not admitted into evidence, and
entered the record only as a bill of exceptions. Because the document
was not admitted into evidence and was never before the jury, we may
not consider this document in our review of the sufficiency of the
evidence. Appellants do not refer to this document or raise any
complaint related to it in their appeal.
4. The jury's finding disregarding the corporate separateness of the
Valero defendants is without effect to Mercado, which is not part of the
Valero corporate family. However, because we determine in this
opinion that the city was not entitled to recover damages from
Mercado, Mercado has no responsibility for any costs.
5. The only damages assessed against appellant Mercado Gas
Services, Inc., were for tortious interference with contract. Because we
remove the city's recovery on this claim, we render judgment that the
city take nothing as to Mercado.

6. Artripe v. Hughes, 857 S.W.2d 82, 87 (Tex. App.--Corpus Christi 

1993, writ denied); see Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a)(1)
(Vernon 1997). 
7. Jim Walter Homes, Inc. v. Reed, 711 S.W.2d 617, 618 (Tex.
1986). 
8. See Richard Gill, 758 S.W.2d at 928-29.
9. Factors that a factfinder should consider when determining the
reasonableness of a fee include:


(1) the time and labor required, the novelty and difficulty of the
questions involved, and the skill required to perform the legal service
properly;


(2) the likelihood . . . that the acceptance of the particular employment
will preclude other employment by the lawyer;


(3) the fee customarily charged in the locality for similar legal services;


(4) the amount involved and the results obtained;


(5) the time limitations imposed by the client or by the circumstances;


(6) the nature and length of the professional relationship with the client;


(7) the experience, reputation, and ability of the lawyer or lawyers
performing the services; and


(8) whether the fee is fixed or contingent on results obtained or
uncertainty of collection before the legal services have been rendered.


Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818
(Tex. 1997), (citing Tex. Disciplinary R. Prof'l Conduct 1.04, reprinted
in Tex. Gov't Code Ann., tit. 2, subtit. G app. A (Tex. State Bar R. art. 
X, § 9).
10. Ownership of the pipelines were passed between several
different entities as the Valero corporate family restructured. The
complicated chain of ownership is not relevant to this appeal.
11. This figure comes from an "exhibit" to the trial court's
judgment, which calculated 10% simple interest from August 31, 1995,
the day this suit was filed, through the day before the judgment was
signed, November 30, 1998. Appellants do not challenge the pre-judgment interest awarded by the trial court.